No. 25-8021

## UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

DR. FREDERICK WILLIAM "ERIC" CUBIN III,
Plaintiff-Appellant,

v.

MARK GORDON, *in both his personal and official capacities as Governor of Wyoming,*
Defendant-Appellee.

On Appeal from The United States District Court for the District of Wyoming
No. 1:24-CV-00164, Hon. Scott Skavdahl, Presiding

## APPELLANT'S PRINCIPAL BRIEF

Emily Rae
Bridget Conlan
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
(512) 481-4400
erae@ljc.org
bconlan@ljc.org
*Counsel for Appellant*
   *Oral Argument requested

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................i

TABLE OF AUTHORITIES ................................................. iii

STATEMENT OF RELATED CASES ................................... 1

JURISDICTIONAL STATEMENT ........................................ 1

STATEMENT OF THE ISSUE ............................................. 2

STATEMENT OF THE CASE............................................... 2

A.    Dr. Cubin and the Wyoming Board of Medicine ........................ 3

B.    Dr. Cubin's Support for "Chloe's Law"........................................ 4

C.    Governor Gordon's Termination of Dr. Cubin for His Email
      Supporting Chloe's Law.................................................. 6

D.    Procedural History....................................................... 9

STANDARD OF REVIEW .................................................. 10

SUMMARY OF THE ARGUMENT ..................................... 12

ARGUMENT ...................................................................... 17

I.    Dr. Cubin has established a prima facie case under the
      *Garcetti/Pickering* five-factor test that Governor Gordon
      violated his First Amendment rights by terminating him. ...... 17

II.    Dr. Cubin is entitled to a preliminary injunction because he is likely to succeed on the merits, will suffer irreparable harm absent an injunction, and public interest favors an injunction. 44

III. Governor Gordon is not entitled to qualified immunity for claims against him in his personal capacity. ........................................50

IV. Governor Gordon is not entitled to immunity for claims against him in his official capacity.............................................................55

V. Dr. Cubin's state constitutional claim should not be dismissed. ...56

CONCLUSION.......................................................................................57

REQUEST FOR ORAL ARGUMENT .................................................57

CERTIFICATE OF COMPLIANCE....................................................59

CERTIFICATE OF DIGITAL SUBMISSION ...................................60

CERTIFICATE OF SERVICE ............................................................61

ADDENDUM..........................................................................................62

   Order Granting Judgment on the Pleadings
   (Dkt. 63, April 14, 2025) …………………….…………....... Add. 001

   Judgment in Favor of Defendant
   (Dkt. 64, April 14, 2025) ..................................................... Add. 031

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Johnson,*
   194 F.3d 1149 (10th Cir. 1999) ............................................................ 36

*Bordelon v. Chicago School Reform Bd. of Trustees,*
   8 F. Supp. 2d 779 (N.D. Ill. 1998) ...................................................... 46

*Brammer-Hoelter v. Twin Peaks Charter Acad.,*
   492 F.3d 1192 (10th Cir. 2007) ...................................................... 23, 34

*Brown v. City of Tulsa,*
   124 F.4th 1251 (10th Cir. 2025) .............................. 23, 24, 28, 34, 37

*Bruder v. Smith,*
   No. 05-74511, 2005 U.S. Dist. LEXIS 38246 (E.D. Mich. Dec. 22,
   2005) .................................................................................................... 47

*Cragg v. City of Osawatomie,*
   143 F.3d 1343 (10th Cir. 1998) ...................................................... 29, 30

*Curtis v. Okla. City Pub. Sch. Bd. of Educ.,*
   147 F.3d 1200 (10th Cir. 1998) ...................................................... 34, 38

*Duda v. Elder,*
   7 F.4th 899 (10th Cir. 2021) ...................................................... 23, 24, 53

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................................ 45

*Ex parte Young,*

209 U.S. 123 (1908).................................................................55

*Free the Nipple-Fort Collins v. City of Fort Collins*,
   916 F.3d 792 (10th Cir. 2019) ............................................45

*Garcetti v. Ceballos*,
   547 U.S. 422 (2006) ....................................12, 18, 34, 38, 39

*Garcia v. Bd. of Educ.*,
   777 F.2d 1403 (10th Cir. 1985) ..........................................49

*Greater Yellowstone Coal. v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) ..........................................45

*Isler v. N.M. Activities Ass'n*,
   No. 10-00009 MV/WPL, 2010 U.S. Dist. LEXIS 144454 (D.N.M. Feb.
   19, 2010)................................................................47

*Lane v. Franks*,
   573 U.S. 228 (2014) ......................................................20

*Lighton v. Univ. of Utah*,
   209 F.3d 1213 (10th Cir. 2000) ..........................................20

*Meyer v. Grant*,
   486 U.S. 414 (1988) ......................................................38

*Moore v. City of Wynnewood*,
   57 F.3d 924 (10th Cir. 1995) ............................................30

*Mueggenborg v. Nortek Air Sols., LLC*,
   No. 20-6147, 2021 U.S. App. LEXIS 30860 (10th Cir. Oct. 15, 2021) 28

*Nken v. Holder*,

556 U.S. 418 (2009) .................................................................. 49

*Oldridge v. Layton,*
    Nos. 22-3284, 23-3070, 2024 U.S. App. LEXIS 10688 (10th Cir. May
    2, 2024) .......................................................................... 33

*Pickering v. Board of Education,*
    391 U.S. 563 (1968) ...................................................... 18, 23

*Pryor v. Sch. Dist. No. 1,*
    99 F.4th 1243 (10th Cir. 2024) ....................... 21, 35, 36, 37, 45, 49, 50

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) ........................................................ 34, 51

*Rankin v. McPherson,*
    483 U.S. 378 (1987) .............................................................. 38

*Robinson v. Barnhart,*
    366 F.3d 1078 (10th Cir. 2004) .............................................. 28

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009) .............................................. 44

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
    515 U. S. 819 (1995) .............................................................. 52

*Rosenblatt v. Baer,*
    383 U.S. 75 (1966) ................................................................ 49

*Sable Commc'ns, Inc. v. FCC,*
    492 U.S. 115 (1989) .............................................................. 36

*Schrier v. University of Colorado,*

427 F.3d 1253 (10th Cir. 2005) ........................................... 48

*Singh v. Cordle,*
936 F.3d 1022 (10th Cir. 2019) ........................................... 50

*Snyder v. Phelps,*
562 U.S. 443 (2011) .............................................................. 22

*Stanton v. Sims,*
571 U.S. 3 (2013) .................................................................. 50

*Stengle v. Ofc. of Dispute Resolution,*
631 F. Supp. 2d 564 (M.D. Pa. 2009) ...................................... 39, 40, 41

*Trant v. Oklahoma,*
754 F.3d 1158 (10th Cir. 2014) ........................................ 13, 18, 23, 34

*Ware v. Unified Sch. Dist.,*
881 F.2d 906 (10th Cir. 1989) ............................................. 34

*Wood v. Moss,*
572 U.S. 744 (2014) .............................................................. 52

*Wulf v. City of Wichita,*
883 F.2d 842 (10th Cir. 1989) ............................................. 24

## Statutes

28 U.S.C. § 1331 ...................................................................... 1

28 U.S.C. § 1343 ...................................................................... 1

28 U.S.C. § 1367 ...................................................................... 57

42 U.S.C. § 1983...................................................................................1

## STATEMENT OF RELATED CASES

This case was previously before this court as an interlocutory appeal of the district court's denial of Plaintiff-Appellant's motion for preliminary injunction, Case No. 24-8084. Plaintiff-Appellant filed his principal brief in this Court on March 26, 2025, but the district court granted judgment on the pleadings on April 14, 2025, before Defendant-Appellee could file his brief in the appeal. That appeal was dismissed on May 2, 2025, by grant of motion for voluntary dismissal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellant's claims present federal questions arising under the First Amendment of the U.S. Constitution. The district court also had jurisdiction under 28 U.S.C. § 1343 because Plaintiff-Appellant brought this action under 42 U.S.C. § 1983.

On April 14, 2025, the district court issued an opinion and order granting Defendant-Appellee's motion for judgement on the pleadings.

1

App. Vol. 1 at 237. On April 18, 2025, Plaintiff-Appellant filed his timely notice of appeal. App. Vol. 1 at 268.

## STATEMENT OF THE ISSUE

Wyoming Governor Mark Gordon terminated Plaintiff-Appellant Dr. Eric Cubin from his position on the Wyoming Board of Medicine in response to an email Dr. Cubin sent to the Wyoming House of Representatives expressing his personal support for legislation to ban certain "gender-affirming" procedures for minors. Has Dr. Cubin established a prima facie case alleging that Governor Gordon violated his First Amendment rights, such that the district court's grant of judgment on the pleadings in favor of Governor Gordon was inappropriate, thus warranting entry of a preliminary injunction?

## STATEMENT OF THE CASE

This case is about Wyoming Governor Mark Gordon's termination of Plaintiff-Appellant Dr. Eric Cubin from the Wyoming Board of Medicine in retaliation for Dr. Cubin's support of legislation that would prohibit

(and, having passed, now does prohibit) certain "gender-affirming" procedures for minors.

**A. Dr. Cubin and the Wyoming Board of Medicine**

Dr. Cubin is an experienced and accomplished Wyoming-licensed doctor specializing in radiology. App. Vol. 1 at 10, 82. Governor Gordon appointed Dr. Cubin to the Wyoming Board of Medicine (the "Board") in 2023 and reappointed him for a four-year term in 2024. App. Vol. 1 at 13.

Governor Gordon is responsible for nominating individuals to serve on the Board with the advice and consent of the State Senate. App. Vol. 1 at 13. The Board is responsible for overseeing medical regulation, compliance and discipline, which includes ensuring that physicians adhere to state laws as well as issuing, renewing, and suspending licenses for physicians and other medical practitioners. App. Vol. 1 at 13, 83. Board members serve four-year terms and cannot be appointed to more than three consecutive terms. App. Vol. 1 at 13. Board members

3

receive compensation for their service and are paid in the same manner and amount as members of the Wyoming Legislature. App. Vol. 1 at 83.

**B. Dr. Cubin's Support for "Chloe's Law"**

In early 2024, the Wyoming legislature was considering Senate File 99, referred to as "Chloe's Law," which would prohibit certain gender-affirming procedures for minors in Wyoming. App. Vol. 1 at 13. Leaders of the Washington Medical Society ("WMS")—a voluntary professional organization for Wyoming medical profession, of which Dr. Cubin has been a member for more than 15 years—and Dr. Michael Sanderson, president of the Wyoming Chapter of the American Academy of Pediatrics, publicly opposed Chloe's Law in testimony before the Wyoming legislature. App. Vol. 1 at 15, 84.

On February 21, 2024, Dr. Cubin emailed Sheila Bush, the Executive Director of WMS, to express his concerns about WMS's position on Chloe's Law and to request that WMS present views of physicians on both sides of the issue. *Id*. Dr. Cubin and WMS leadership exchanged

4

emails over the next several days, but WMS failed to address Dr. Cubin's concerns to his satisfaction. App. Vol. 1 at 16.

Then, on February 28, 2024, Dr. Cubin sent all members of the Wyoming House of Representatives an email expressing his personal support for Chloe's Law and his criticism of WMS's position against it. *Id.* Dr. Cubin's email—sent from his personal email account—made clear that he was representing only himself as a "physician in Casper" writing "from the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born." App. Vol. 1 at 16, 30, 31, 85. Dr. Cubin did not purport to speak on behalf of WMS or the Board; indeed, his email did not even mention the Board nor his position on the Board. Dr. Cubin's email stated that he had "no idea why the WMS has elected to take this unnecessary position that is so clearly contrary to the viewpoint of the majority of their members." App. Vol. 1 at 31. Dr. Cubin's email also noted a suspected partnership between WMS and Dr. Sanderson, due to their presentation of nearly identical positions to the legislature. *Id.* Aside from Dr. Sanderson, Dr.

5

Cubin's email did not mention any other physicians by name, only referencing "several very vocal, extremely liberal members of the [WMS] Board." App. Vol. 1 at 30. Dr. Cubin's email went on to state that he "fe[lt] the need to advocate on [his] own behalf by coming to [the members of the House of Representatives] directly" to express his concerns that WMS's position on Chloe's Law did not "faithfully represent the physicians in [Wyoming]." App. Vol. 1 at 31. Chloe's Law ultimately passed, and Governor Gordon signed it into law on March 22, 2024. App. Vol. 2 at 282.

## C. Governor Gordon's Termination of Dr. Cubin for His Email Supporting Chloe's Law

On April 22, 2024, Dr. Cubin received a phone call from the Governor's Chief of Staff, Drew Perkins, informing him that, because of the email he had sent to the House of Representatives and the positions he had taken, the Governor had decided to remove him from the Board. App. Vol. 1 at 85-86. Immediately after the phone call, Dr. Cubin received a signed letter from Governor Gordon, by email attachment,

notifying him that the Governor was removing him from the Board. App. Vol. 1 at 33, 86.

Governor Gordon stated in the letter that he had "been made aware of [Dr. Cubin's] email to the members of the House of Representatives during this last legislative session regarding [Chloe's Law] in which [Dr. Cubin] strongly encouraged the members to pass this legislation and criticized the Wyoming Medical Society's opposition to the bill." App. Vol. 1 at 33. The letter stated that Governor Gordon "believes" Dr. Cubin's "personal comments" in his email to legislators regarding Chloe's Law "could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that [Dr. Cubin] might use [his] position to advocate for a particular position when considering matters that should be considered absent an agenda," and that "medical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone." App. Vol. 1 at 33, 86. Governor Gordon stated that "even the appearance of bias can be disquieting" and that individual members

7

of the Board are not "entitled to speak for the Board unilaterally." App.

Vol. 1 at 33. Dr. Gordon's letter further stated that he was terminating

Dr. Cubin "as I have done before, when a member of a board chooses to

express personal beliefs in a way that can be construed as speaking for

the body." App. Vol. 1 at 33. Governor Gordon stated that he "believe[s]

it is best to remove [Dr. Cubin] from the Board of Medicine" and

"urge[d] [Dr. Cubin] to continue to advocate for [his] beliefs." *Id.*

As a member of the Board, Dr. Cubin always fulfilled his duties and

obligations in a professional, unbiased, and clinical manner based on

the merits alone. App. Vol. 1 at 19, 83. But for Dr. Cubin's email to the

Wyoming House of Representatives expressing his personal views on

Chloe's Law, he would not have been removed from the Board. App. Vol.

1 at 18.

Political advocacy did not disqualify past Board members from

service or result in removal from the Board; for example, Dr. Rene

Hinkle continued to serve on the Board after testifying before the

Wyoming legislature against giving life-saving care to infants born alive

8

after an attempted abortion and was reappointed to the Board after that political testimony. App. Vol. 1 at 18. To Dr. Cubin's knowledge, his email to the Wyoming House of Representatives did not result in any complaints from other members of the Board, nor did it impact the Board's functioning in any way. App. Vol. 1 at 85. Valerie Mockensturm, a fellow Board member, testified before the district court that she was not aware of Dr. Cubin's email until April 2024, and that in April 2024 "the only minor disruption [to Board official duties and activities] was Dr. Cubin was not at that Board meeting." App. Vol. 2 at 356-358. Ms. Mockensturm further testified that she "never" observed Dr. Cubin acting in a biased manner regarding any of his official Board duties and that she would like to see him restored to the Board. *Id.*

## D. Procedural History

Dr. Cubin filed suit against Governor Gordon on August 29, 2024, alleging that his termination from the Board in retaliation for his email to House members violated his First Amendment rights of free speech and petition. App. Vol. 1 at 10, 17-21.

9

Dr. Cubin moved for a preliminary injunction to restore him to his position on the Board during this litigation. App. Vol. 1 at 45. The district court denied the motion on November 14, 2024. App. Vol. 1 at 146. Dr. Cubin filed a timely notice of appeal on December 9, 2024. App. Vol. 1 at 170.

Defendant moved for judgment on the pleadings on November 25, 2024. App. Vol. 1 at 171. The district court granted Defendant's motion for judgment on the pleadings on April 14, 2025. App. Vol. 1 at 237. Dr. Cubin filed a timely notice of appeal on April 18, 2025. App. Vol. 1 at 268.

## STANDARD OF REVIEW

This Court reviews "a district court's grant of a motion for judgment on the pleadings de novo, using the same standard that applies to a Rule 12(b)(6) motion" and "accept[ing] all facts pleaded by the non-moving party as true and grant[ing] all reasonable inferences from the pleadings in favor of the same." *Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006). "Judgment on the pleadings should

10

not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" *Id*. (quoting *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000)).

Further, "[t]o obtain a preliminary injunction, a movant must establish four factors: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the court denies the injunction; (3) the movant's harm without the injunction outweighs the other party's harm with the injunction; and (4) the injunction is not adverse to the public interest." *Pryor v. Sch. Dist. No. 1*, 99 F.4th at 1250 (citation omitted). Where the district court relied largely on likelihood of success on the merits involving a question of law, the court conducts de novo review of the district court's conclusions on likelihood of success. *Derma Pen, LLC,* 773 R.3d at 1119.

11

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellant Dr. Eric Cubin sent Wyoming legislators an email, in his personal capacity as a physician, expressing his support for legislation banning certain "gender-affirming" procedures for minors. In response, Wyoming Governor Mark Gordon fired Dr. Cubin from his position on the Wyoming Medical Board. Dr. Cubin has established a prima facie case that the First Amendment protected his speech, and the district court erred in granting judgment on the pleadings in favor of Governor Gordon. Not only has Dr. Cubin established a prima facie case, as required to prevail as the non-movant on a motion for judgment on the pleadings, but the facts as pleaded demonstrate that Dr. Cubin is likely to succeed on the merits of his claims.

Precedent prescribes a five-factor test—derived from *Garcetti v. Ceballos*, 547 U.S. 422 (2006)—to determine whether the First Amendment protects a government employee's speech against retaliation. Three of those factors are undisputed and favor Dr. Cubin.

12

The two disputed factors—whether the speech was on a matter of public concern and whether the government's interest in efficiency outweighs the employee's free speech rights—favor Dr. Cubin as well.

To prevail on the latter, the government must show, with evidence, that the government's interest in "avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships" outweighs the employees right to free speech. *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014).

The district court erred in concluding that the government had met its burden. The district court wrongly concluded that Dr. Cubin's termination was based on the Governor's prediction that Dr. Cubin's email to legislators could create a perception of bias against certain individuals—specifically, one particular doctor and leaders of the Wyoming Medical Society, who opposed Chloe's Law, and whom Dr. Cubin criticized in his email. That was not the basis of Dr. Cubin's termination stated in Governor Gordon's letter. Rather, Governor Gordon cited Dr. Cubin's comments *on the legislation* and the supposed

appearance that Dr. Cubin was speaking on behalf of the Board, when he clearly was not.

Further, the evidence does not support any prediction that Dr. Cubin would be biased (or perceived as biased) against any physicians who appear before the Board. Dr. Cubin's letter advocated in favor of legislation that is now Wyoming law, which he is required to apply as a Board member. And nothing in his letter suggests he would lack impartiality with respect to the bill's opponents whom he criticized; he did not impugn their character or abilities as physicians. And there is no reason to believe that any perception of bias against those few individuals (however unwarranted) would interfere with the Board's work because there is no reason to believe those individuals will have a matter before the Board during the remainder of Dr. Cubin's four-year term.

Governor Gordon also lacked any evidentiary support for the other basis he stated for Dr. Cubin's termination: that Dr. Cubin's email could be construed as expressing the views of the Board. Nothing in Dr.

14

Cubin's email—sent from his personal account, expressly on his own behalf, with no mention of the Board or his position on it—could give that impression.

The only record evidence about the effect on the Board comes from a member who testified that she had never seen Dr. Cubin act in a biased or prejudicial way, that the only disruption to the Board was his absence, and that she wanted him to be restored to the Board.

Also, the district court erred in concluding that other considerations outweighed Dr. Cubin's interest in free speech. Dr. Cubin engaged in speech to the legislature regarding pending legislation, which receives the First Amendment's strongest protection. And his speech was far less potentially disruptive than other speech that this Court has found to be protected against retaliation.

The district court also erred in not recognizing that any perception of bias (however baseless) could be sufficiently addressed by recusal. In fact, Dr. Cubin has stated that he would recuse himself in the unlikely

15

event that any of the physicians he criticized in his email had a matter before the Board.

The district court rightly agreed that Governor Gordon is not entitled to Eleventh Amendment sovereign immunity for claims against him in his official capacity because Dr. Cubin alleges an ongoing violation of his federal constitutional rights and seeks prospective injunctive relief, meeting the requirements of *Ex parte Young*, 209 U.S. 123 (1908). App. Vol. 1 at 250.

The district court erred in finding that Governor Gordon would be entitled to qualified immunity for claims against him in his personal capacity because the Governor's removal of Dr. Cubin from the Wyoming Board of Medicine in retaliation for his email, for the reasons stated in the termination letter, violated Dr. Cubin's clearly established First Amendment rights.

The district court erred in dismissing Dr. Cubin's state constitutional claim because Dr. Cubin established prima facie claims of First

16

Amendment violations under the U.S. Constitution, providing supplemental jurisdiction over the state constitutional claim.

Thus, the district court erred in granting judgment on the pleadings in favor of Governor Gordon as to the federal constitutional claims and in dismissing the state constitutional claim. This court should reverse the district court's judgment on the pleadings and also enter a preliminary injunction restoring Dr. Cubin to his position on the Board.

### ARGUMENT

### I.  Dr. Cubin has established a prima facie case under the *Garcetti/Pickering* five-factor test that Governor Gordon violated his First Amendment rights by terminating him.

Dr. Cubin has established a prima facie case for a First Amendment violation because the record shows (1) that Governor Gordon removed Dr. Cubin in retaliation for speech that Dr. Cubin made as a private citizen on a matter of public concern and (2) that Dr. Cubin's speech has not interfered, and cannot reasonably be expected to interfere, with the Board's operations and functioning. All that is required for survival of a motion for judgment on the pleadings is a prima facie case, drawing all

inferences in favor of the non-movant; but the facts presented here go farther than that, demonstrating that each element actually favors Dr. Cubin, warranting a finding of likely success on the merits and grant of a preliminary injunction.

To determine whether the First Amendment protects a government employee's speech, this Court applies the five-step framework derived from the Supreme Court's decisions in *Garcetti v. Ceballos*, 547 U.S. 422 (2006) and *Pickering v. Board of Education*, 391 U.S. 563 (1968). *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). That framework analyzes whether (1) the speech at issue occurred within the scope of employment; (2) the speech was about a matter of public concern; (3) the government's interest in efficiency outweighs the employee's free speech rights; (4) the plaintiff's speech was a motivating factor in the adverse employment action; and (5) the same employment decision would have been reached absent the protected speech. *Id*. "The first three factors present questions of law that [this Court] review[s] de novo." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024).

18

### A. Governor Gordon only disputes two of the five *Garcetti* factors.

In his motion for judgment on the pleadings, Governor Gordon has not disputed that the first, fourth, and fifth *Garcetti* factors favor protecting Dr. Cubin's speech. App. Vol. 1 at 178, 252.

The first factor favors Dr. Cubin because Dr. Cubin wrote and sent his email to the Wyoming House of Representatives in his personal capacity, not acting within the scope of his official duties. App. Vol. 1 at 97, 158, 253. The email, sent from his personal account, explicitly stated that he was speaking "on his own behalf" and "from the perspective of a Wyoming Doctor." App. Vol. 1 at 30. It made no reference to his Board membership.

The fourth and fifth *Garcetti* factors are undisputed and favor Dr. Cubin because the Governor's letter makes clear that Dr. Cubin's email to the Wyoming Legislature was the sole motivating factor for his removal. App. Vol. 1 at 32, 97, 158.

### B. The second *Garcetti* factor favors Dr. Cubin.

19

The district court erred in finding that Dr. Cubin's comments did not involve a matter of public concern. App. Vol. 1 at 255. Dr. Cubin's email clearly involved a matter of public concern—that is, "it can be fairly considered as relating to [a] matter of political, social, or other concern to the community, or . . . a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014); *see also Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000) (defining matters of public concern as "those of interest to the community whether for social, political or other reasons").

Dr. Cubin's message to legislators addressed a matter of public concern because it directly advocated for Chloe's Law, a piece of pending legislation, and brought to light concerns that an interest group had misrepresented the views of its members, including Dr. Cubin and other Wyoming physicians, in testimony before the Wyoming Legislature. App. Vol. 1 at 30, 97, 158. Contrary to the district court's analysis, statements that the district court has characterized as "extraneous

20

comments" do not take Dr. Cubin's email out of the realm of public concern. App. Vol. 1 at 253.

In *Pryor v. Sch. Dist. No. 1*, the plaintiff succeeded on his First Amendment retaliation claim where his speech had "presented his grievances to the board and members of the administration, and made specific requests for change that would affect the entire community." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1251-52 (10th Cir. 2024). The court held that "[e]ven if personal grievances partially motivate speech, the speech still involves matters of public concern" where "Plaintiff spoke on matters of serious concern to the taxpaying public." *Id.* at 1251-1253. Likewise, Dr. Cubin's email to the Wyoming legislature still involved a matter of public concern even if it also touched on his personal grievances with WMS and Dr. Sanderson.

Dr. Cubin's concerns about WMS, an organization that actively lobbies the legislature to influence lawmaking, can "be fairly considered as relating to any matter of political, social, or other concern to the community," and addresses "a subject of legitimate news interest; that

21

is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and quotations omitted).

Dr. Cubin's email to the Wyoming legislature still involved a matter of public concern even if it also touched on his personal grievances with WMS, because WMS's inaccurate statements were made to the state's lawmaking body and have not only the potential, but the intent, to impact all Wyomingites through political lobbying. Concerns about the political agenda and inaccuracy of statements made by an organization actively lobbying the Wyoming legislature are not merely a "personal dispute," as the district court has mischaracterized them. App. Vol. 1 at 253. Therefore, Dr. Cubin's entire email satisfies the second *Garcetti* factor.

## C.  The third *Garcetti* factor favors Dr. Cubin.

The only remaining *Garcetti* factor that the Governor disputes—the third—"requires the court to balance the employee's right to free speech against the government's interests as an employer." *Brown v. City of*

22

*Tulsa*, 124 F.4th 1251, 1267 (10th Cir. 2025) (citing *Pickering*, 391 U.S. at 568). This factor favors protecting Dr. Cubin's speech because his email did not interfere with the Board's work or its ability to function efficiently, and the Governor has not presented sufficient evidence to support a reasonable prediction of such interference.

To prevail on this factor, the government bears the burden to show that its interest in promoting the efficiency of public service outweighs the plaintiff's free-speech interests. *Duda v. Elder*, 7 F.4th 899, 912 (10th Cir. 2021). And "[t]he only public employer interest that [can] outweigh[] the employee's free speech interest is 'avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'" *Trant*, 754 F.3d at 1166 (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007)). Additionally, "[t]he government bears the burden of proving—*with evidence*—both its specific interest in taking the adverse employment action against the plaintiff and that it acted

23

based on that interest, rather than for another reason." *Brown*, 124 F.4th at 1268.

Thus, it is not enough for the Governor to demonstrate that a reasonable justification for terminating Dr. Cubin existed; he must show that he actually acted based on *that* interest, not for another reason, supported by sufficient evidence at the time of termination.

"In analyzing the employer's interest in avoiding disruption, different standards apply depending on whether the adverse employment action occurred 'long after' or 'soon after' the employee's protected speech." *Duda*, 7 F.4th at 912. The employer must "prove 'actual disruption' when the adverse employment action took place 'long after' the employee spoke on a matter of public concern." *Id*. For adverse actions taken "soon after" the speech, the employer need not show that actual disruption occurred but still must present specific evidence to support a reasonable prediction of disruption; "purely speculative allegations are insufficient." *Wulf v. City of Wichita*, 883 F.2d 842, 862 (10th Cir. 1989). Here, the parties have disputed whether Dr. Cubin's

termination occurred "soon after" or "long after" his speech, and the

district court deemed termination 54 days after his email to be "soon

after." App. Vol. 1 at 160. It makes no difference, however, because the

Governor has not satisfied his burden under either standard: that is, he

has neither shown that Dr. Cubin's email to legislators caused actual

disruption, nor presented specific evidence that would support a

reasonable, non-speculative prediction of disruption.

### 1. The district court erred in accepting post hoc justifications, substituted for the reasons actually stated in Governor Gordon's termination letter.

The district court erred in concluding that Dr. Cubin's firing was

justified under the First Amendment because his email supposedly

could create a perception of bias against certain individuals—in

particular, against Dr. Sanderson and the Wyoming Medical Society

leadership. According to the district court, "the real issue" underlying

Dr. Cubin's termination was "that Dr. Cubin's comments to the

Wyoming House went beyond his support for Senate File 99 and into his

personal disagreements with WMS and specific doctors[.]" App. Vol. 1 at 161, 259.

That justification fails because it was not a justification articulated in Governor Gordon's letter firing Dr. Cubin. Governor Gordon's letter cited two justifications for Dr. Cubin's termination, neither of which concerned "his disputes with WMS and specific doctors": his comments *on the legislation* and the supposed perception that he was speaking on the Board's behalf.

First, the Governor's letter cites Dr. Cubin's "comments on this particular legislation"—not the "disputes with WMS and specific doctors" that the district court referenced—as the basis for his termination. App. Vol. 1 at 32. Governor Gordon's letter says that Dr. Cubin's comments could make doctors "concerned that [he] might use [his] position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice," App. Vol. 1 at 32—indicating concern about Dr. Cubin based on his *political or policy views—i.e.*, a "particular position," as expressed in his letter.

26

The district court stated that "it was reasonable for Governor Gordon to predict Dr. Cubin's extraneous comments to the Wyoming House concerning WMS and his membership on the Board could cause the Board's impartiality to be questioned and disrupt at least some of the Board's core functions" (App. Vol. 1 at 261), but Governor Gordon's letter contained no such prediction. Again, in stating the basis for Dr. Cubin's termination, the Governor's letter did not cite "extraneous comments" but instead referenced Dr. Cubin's "comments on this particular legislation." App. Vol. 1 at 32.

Governor Gordon's letter also states that he was firing Dr. Cubin "as I have done before, when a member of a board chooses to express personal beliefs in a way that can be construed as speaking for the body"—suggesting that this is the real basis for Dr. Cubin's firing. App. Vol. 1 at 32. That reason (which, as discussed below, is baseless) has nothing to do with supposed bias against particular individuals that the district court cited as the basis for Dr. Cubin's termination. App. Vol. 1 at 163, 164, 260.

27

Governor Gordon cannot justify Dr. Cubin's termination—and the district court could not do so—with a post hoc rationalization that appears nowhere in his termination letter and is contradicted by the explanation in the termination letter. Again, "[t]he government bears the burden of proving—*with evidence*—both its specific interest in taking the adverse employment action against the plaintiff *and that it acted based on that interest, rather than for another reason.*" *Brown*, 124 F.4th at 1268 (second emphasis added); *cf. Mueggenborg v. Nortek Air Sols., LLC*, No. 20-6147, 2021 U.S. App. LEXIS 30860, at *23 (10th Cir. Oct. 15, 2021) ("post hoc justifications for termination constitute evidence of pretext," and pretext can be reasonably inferred from "an employer's shifting or inconsistent explanations for [a] challenged employment decision"); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (agency decisions must be "evaluated based solely on the reasons stated in the decision"). The Governor has not met that burden here.

28

This Court should focus on the reasons Governor Gordon actually stated in Dr. Cubin's termination letter to determine whether they form—and whether the Governor has substantiated—a reasonable prediction of disruption that outweighs Dr. Cubin's strong interest in free speech.

> **2.    The bases stated in Governor Gordon's letter are not reasonable predictions of disruption because they lack supporting evidence.**

The evidence does not support a reasonable prediction of disruption, let alone an actual disruption, that could justify Governor Gordon's termination of Dr. Cubin for his speech.

Although the standard is lower for terminations occurring "soon after" the employee's speech occurs—before enough time has elapsed for actual disruption to occur—an employer still must show specific evidence to support its prediction of disruption. *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1347 (10th Cir. 1998) ("We will defer to a public employer's reasonable predictions of disruption, but those predictions must be supported by the presentation of specific

29

evidence."). A public employer "cannot satisfy its burden by making 'purely speculative allegations.'" *Id.* (citing *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995)).

Governor Gordon's position that Dr. Cubin's comments on the legislation could make doctors believe he is biased makes little sense. Dr. Cubin simply expressed support for a law governing the practice of medicine, which then became law. App. Vol. 1 at 154. So the only apparent arguable "bias" Dr. Cubin could have going forward, based on his advocacy, would be one in favor of applying current Wyoming law—which he must do anyway as a Board member. There is no reason to believe that this supposed "bias" would disrupt the Board's work or efficiency.

Even if Governor Gordon's termination of Dr. Cubin had been based on concerns about his criticisms of Dr. Sanderson and WMS leadership—which it was not—that could not justify the termination. Nothing in Dr. Cubin's comments suggests he would lack impartiality in his capacity as a Board member. Although he criticized certain

30

physicians' political advocacy, he did not impugn their character or abilities *as physicians*. And there is no basis for concluding that Dr. Cubin's comments would interfere with the Board's work or efficiency. To do so, one would have to assume—in the absence of any evidence—not only that Dr. Cubin would be biased (or that others would perceive him to be so), but also that one of a handful of physicians would have a matter before him during the remainder of his four-year term, and that recusal (discussed further below) would not suffice to address any concerns.

Governor Gordon also has failed to substantiate any basis for his letter's other proffered justification for firing Dr. Cubin: that his email to the Wyoming House of Representatives expressed his "personal beliefs in a way that can be construed as speaking for the [Board]." App. Vol. 1 at 32. Indeed, before the district court, Governor Gordon did not dispute that Dr. Cubin's letter was sent in his personal capacity, not within the scope of his employment. App. Vol. 1 at 158, 252. And nothing in Dr. Cubin's letter could give the impression that he was

31

speaking on the Board's behalf. His letter came from his personal email account, identified him as "a physician in Casper," stated that it was providing "the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born," and made no explicit or implicit reference to the Wyoming Board of Medicine or his position on the Board. App. Vol. 1 at 29.

Fellow Board member Valerie Mockensturm's testimony describing Dr. Cubin as "courteous," "morally and ethically perfect," and an "asset" on the Board further undermines the alleged reasonableness of the Governor's prediction of disruption. App. Vol. 2 at 357. Ms. Mockensturm testified that she never observed Dr. Cubin acting in a biased or prejudicial manner regarding any of his official duties, and that the only disruption to Board activities following Dr. Cubin's comment was that he was not present at a Board meeting. App. Vol. 2 at 357-358. Fellow Board members would seemingly be the best predictors of future disruption to internal board functioning following Dr. Cubin's statement. There is no evidence in the record that the

32

Governor ever asked Board members about the potential for disruption;
the only evidence of Board members' views on that question—Ms.
Mockensturm's testimony—demonstrates that, if the Governor had
done so, he would have had any such worries extinguished. Thus, the
Governor failed to perform a "factual analysis to support [his] naked
assertion that Plaintiff's statements . . . would disrupt efficiency,"
*Oldridge v. Layton*, Nos. 22-3284, 23-3070, 2024 U.S. App. LEXIS
10688, at *10 (10th Cir. May 2, 2024), and instead jumped to a
conclusion and misjudged the potential for disruption following Dr.
Cubin's comments to the legislature.

> ### 3. The district court erred in concluding that Dr. Cubin's strong interest in free speech was outweighed by lesser considerations.

The district court erred in concluding that other considerations
outweighed Dr. Cubin's interest in free speech. App. Vol. 1 at 255.

Again, in considering the third *Garcetti* factor, "[t]he only public
employer interest that outweighs the employee's free speech interest is
'avoiding direct disruption, *by the speech itself*, of the public employer's

internal operations and employment relationships.'" *Trant*, 754 F.3d at 1166 (citing *Brammer-Hoelter,* 492 F.3d at 1207). This is a balancing test; speech restrictions cannot be justified by the existence of only minimal disruption. Public employees "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti,* 547 U.S. at 422. And "the more important the speech is to the public discourse, the greater the burden on the employer to justify responding adversely to it." *Brown*, 124 F.4th at 1268 (citing *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998)); *see also Ware v. Unified Sch. Dist.*, 881 F.2d 906, 910 (10th Cir. 1989) ("The employer's burden to justify its restriction on speech increases in proportion to the value of that speech in the public debate."). The Supreme Court has "long recognized that when government regulates political speech or the expression of editorial opinion on matters of public importance, First Amendment protection is 'at its zenith.'" *See R.A.V. v. St. Paul*, 505 U.S. 377, 429 (1992) (cleaned up).

Dr. Cubin was engaged in this most important speech, entitled to the strongest First Amendment protection, when he gave his opinion on Chloe's Law and alerted legislators to an interest group's misrepresentations to the legislature about pending legislation.

Dr. Cubin does not believe his email was rude or inflammatory—but even if some perceived it that way, that would not overcome his strong interest in free speech on matters of public concern. In *Pryor*, this Court found that a coach's interest in making inflammatory statements related to matters of public concern outweighed a public school district's interest in efficiency. 99 F.4th at 1252. The coach had advocated for changes in district operations, called for the resignation or termination of district officials, and criticized district officials for operational missteps or decisions with which he disagreed, and his comments included derogatory statements directed at staff. *Id*. at 1249. For example, the coach's statements included: "Watch out for the Black folks trying to Whitesplain this bullshit" and "Stay the fuck away from me." *Id*. The coach also called the principal "a disgrace to the entire

community" and "derogatory names such as 'plantation builder[.]'" *Id.*
at 1248. The Court nonetheless ruled in the coach's favor because "[t]he
impoliteness, passion, or profanity of his speech [did] not overcome his
free speech interests." *Id.* at 1253 (citing *ACLU v. Johnson*, 194 F.3d
1149, 1156 (10th Cir. 1999) (quoting *Sable Commc'ns, Inc. v. FCC*, 492
U.S. 115, 126 (1989) (the First Amendment protects even indecent
expression))). "[T]he offensive, vulgar manner of Plaintiff's speech [did]
not deprive him of constitutional protections—especially in the context
of petitioning the government for redress for grievances." *Id.* The
coach's interest in speech prevailed even though his inflammatory
statements were directed at his own school's principal and staff.

Dr. Cubin's statements entailed far less potential for disruption than
those of the coach in *Pryor*—and should receive at least as much
protection. Dr. Cubin's comments were candid, but not profane or rude
like those of the coach in *Pryor*. And they were made about Dr.
Sanderson and WMS leadership—individuals who are not part of the
Board and who have no apparent imminent business before the Board.

36

Potential rifts between Dr. Cubin and doctors external to the Board cannot satisfy the Governor's burden to demonstrate disruption to the Board's *internal* operations. *See Brown*, 124 F.4th at 1270; *see also Pryor*, 99 F.4th at 1252 ("Expected public reaction that impacts external relationships does not constitute a detrimental impact and does not weigh in the District's favor."). Likewise, the district court's concern that physicians will "fear that Dr. Cubin might take their silence as tacit agreement with the 'far left' WMS position" and put their medical license at risk (App. Vol. 1 at 163) is speculative, unsupported by evidence (or the bases for Dr. Cubin's termination stated in Governor Gordon's letter), and insufficient to overcome Dr. Cubin's interest in free speech.

> **4.    The district court erred in failing to recognize that the recusal process resolves any lingering concerns about Dr. Cubin's potential for bias.**

The district court erred in concluding that the recusal process would not suffice to address any (speculative) concerns about a perception of bias. App. Vol. 1 at 260-261.

37

It is true that "[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the role entails." *Rankin v. McPherson*, 483 U.S. 378, 390 (1987). Thus, employees serving in a "confidential, policymaking or public contact role" bear a greater burden of caution than those in a clerical role. *Curtis*, 147 F.3d at 1213 (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)).

Still, all public employees "must face only those speech restrictions that are *necessary* for their employers to operate efficiently and effectively," and First Amendment protections are at their "zenith" for political speech. *Garcetti*, 547 U.S. at 422 (emphasis added); *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (explaining the importance of respecting "core political speech"). Here, the recusal process threads that needle to respect Dr. Cubin's right to speak on important political matters without impacting the Board's efficient operation.

The record shows that Dr. Cubin will uphold the laws of Wyoming and will recuse himself "without hesitation" in any case where there is a

question about his impartiality, including any case against Dr.

Sanderson or a WMS board member that would come before him. App.

Vol. 2 at 332. The recusal process and Dr. Cubin's commitment to abide

by it suffice to negate any concerns about an appearance of bias and is

the appropriately tailored response given that public employees "must

face only those speech restrictions that are necessary for their

employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at

422.

    In concluding that recusal would not suffice to address any

perception of "bias," the district court cited a decision from the Middle

District of Pennsylvania that held that "an increased number of recusal

motions" resulting from an independent contractor's blog posts was

potentially disruptive enough to justify a state's decision not to renew

her contract. App. Vol. 1 at 164, 261 (citing *Stengle v. Ofc. of Dispute*

*Resolution*, 631 F. Supp. 2d 564, 577 (M.D. Pa. 2009)).

    Regardless of whether that case was rightly decided, it is inapposite.

There, the plaintiff was a "special education due process hearing officer"

39

who heard disputes related to special education, and who also was
appointed to a special panel established to implement a settlement
agreement related to special education. *Stengle*, 631 F. Supp. 2d at 568-
69. While in those positions, she began publishing a blog discussing
special education issues, specifically for the purpose of "shar[ing]
information about the inclusion and the implementation of the
[settlement agreement] from the perspective of one parent of a class
member and to provide a means to share information with other class
members." *Id.* at 569-70. Her blog posts caused widespread belief that
she could not be impartial as a hearing officer—because she was
opining on issues that would come before her in that role—and resulted
in requests for recusal and the filing of complaints "too numerous to
recount in their totality" in the court's decision. *Id.* at 570-71.

The state then declined to renew her contract on three grounds: (1)
her advocacy on her blog, "which ultimately compromised her ability to
serve as an impartial hearing officer"; (2) refusal to recuse herself in one
matter and "using intemperate langue in denying the recusal motion";

40

and (3) "fail[ure] to comply with timeliness requirements in rendering her opinions." *Id.* at 571-72. The district court concluded that *under those circumstances*, her speech created sufficient potential for disruption, through litigation of recusal motions, to justify the non-renewal of her contract. *Id.*

This case is not comparable. Dr. Cubin has not publicly commented on issues that come before the Board, let alone done so on an ongoing basis. He has not faced any recusal motions based on his letter supporting Chloe's Law. And he has committed to recusing himself in any matters in which anyone questions his impartiality (App. Vol. 2 at 303-304)— eliminating the prospect of disruptive litigation over refusals to recuse present in *Stengle*.

Moreover, the prospect of any occasions calling for recusal is speculative and appears unlikely. The district court extrapolated from Dr. Cubin calling out the WMS Board and Dr. Sanderson specifically that "[b]eyond just Dr. Sanderson and WMS leadership, though, Dr. Cubin's email could also cause others, such as those on the 'left' of the

41

partisan divide to also question whether Dr. Cubin would be a fair and impartial arbiter for them."

But Dr. Cubin did not mention any other physicians by name in his email to the Wyoming House of Representatives. App. Vol. 1 at 30. The district court focused on Dr. Cubin's statement that WMS "has been essentially hijacked by the far left." App. Vol. 1 at 30, 260. But the only statement in Dr. Cubin's email that could potentially imply specific physicians is his reference to "several very vocal, extremely liberal members of the [WMS] Board." *Id*. WMS has 27 Trustees, with one position held by a retired physician and one held by a medical student.[1] At most, then, Dr. Cubin's comments implicate Dr. Sanderson plus some subset of the 25 WMS Trustees who are (presumably) active medical professionals. There is no reason to believe that the Medical Board will be asked to rule on disciplinary issues for all, some, or any of

_____

[1] https://www.wyomed.org/about/board-of-trustees/ (last visited Mar. 24, 2025).

those few individuals during the remainder of Dr. Cubin's four-year
term—let alone on an issue that relates to the views expressed in Dr.
Cubin's email to state legislators.

The district court's conclusion that "[i]t was reasonable for Governor
Gordon to predict Dr. Cubin's extraneous comments to the Wyoming
House concerning WMS and his membership on the Board could cause
the Board's impartiality to be questioned and disrupt at least some of
the Board's core functions" is unsupported by the facts presented. App.
Vol. 1 at 261.

Moreover, any member of the Board could face a recusal motion for a
variety of (more likely) reasons, such as the existence of a past working
or social relationship between the Board member and a physician with
a matter before the Board. Indeed, Dr. Cubin recused himself from
certain matters before he made his comments on Chloe's Law and
testified that he would recuse himself if any disciplinary matter related
to Chloe's Law came before the Board in the future. App. Vol. 1 at 82,
150; App. Vol. 2 at 302, 371. There is no reason why Dr. Cubin should

43

be uniquely penalized because someone *might* seek recusal because he chose to exercise his First Amendment rights on a matter of great concern to both medical professionals and the public, in support of a policy that is now the law of Wyoming.

Because the second and third *Garcetti* factors favor Dr. Cubin, and the Governor does not dispute that the other factors favor protecting Dr. Cubin's speech, Dr. Cubin has not only established a prima facie case for his First Amendment claims, but is also likely to succeed on the merits of his claims warranting further inquiry into the appropriateness of a preliminary injunction.

## II. Dr. Cubin is entitled to a preliminary injunction because he is likely to succeed on the merits, will suffer irreparable harm absent an injunction, and public interest favors an injunction.

"[A] plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting

*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). Dr. Cubin's removal from the Board and ongoing exclusion from his position constitutes irreparable harm in multiple ways.

Tenth Circuit and Supreme Court precedent make clear that a First Amendment violation constitutes irreparable injury. *Pryor*, 99 F.4th at 1254; *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("[W]ell-settled law supports the constitutional-violation-as-irreparable-injury principle."); *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Thus, in *Pryor*, the Court concluded that a school's removal of a coach from his position and exclusion from district facilities in retaliation for speech inflicted an irreparable harm, "even if the restrictions d[id] not directly silence [his] protected speech." 99 F.4th at 1249. Likewise, Dr. Cubin is suffering an impermissible chilling effect on his activities; Dr. Cubin was removed from his Board seat and

45

continues to be restricted from attending meetings of the Board in retaliation for expressing his views.

Additionally, courts have held that an employee suffers irreparable harm when kept out of their former position during the pendency of litigation. In *Bordelon v. Chicago School Reform Bd. of Trustees*, 8 F. Supp. 2d 779 (N.D. Ill. 1998), the court granted a preliminary injunction requiring reinstatement of a school principal, stating that, for every day he was kept out of the position, he would be "denied the opportunity to perform his chosen profession" to which he had "dedicated significant time and energy" and that he would therefore "suffer[] when he is unable to perform in that capacity." *Id.* at 789. The district court further held that the school principal would be harmed by "[his] resume necessarily contain[ing] a reference to his removal from the position" and that no adequate legal remedy existed for those losses. *Id.* Other courts have similarly recognized that preventing an employee from returning to a position to finish out a term can create the assumption that allegations against the employee are true, causing irreparable

injury to the employee's career. *See Isler v. N.M. Activities Ass'n*, No. 10-00009 MV/WPL, 2010 U.S. Dist. LEXIS 144454, at *33-34 (D.N.M. Feb. 19, 2010) (finding irreparable harm where a basketball coach would suffer reputational and career harm if prevented from coaching the remainder of the season); *Bruder v. Smith*, No. 05-74511, 2005 U.S. Dist. LEXIS 38246, at *15 (E.D. Mich. Dec. 22, 2005) (assistant prosecutor's termination would cause stigma, adversely affect her reputation as an effective lawyer within the legal community and thus "may cause, or is likely to cause, her to suffer irreparable harm if a preliminary injunction is not granted immediately").

Here, Dr. Cubin was appointed to a four-year term on the Board of Medicine set to run through 2028. App. Vol. 1 at 56. Abruptly cutting his term short, absent the remediation of a preliminary injunction to reinstate him, may harm his professional reputation as a medical doctor and member of the Wyoming medical community.

Also, Dr. Cubin's harm in the absence of a preliminary injunction will be irreparable because, if the Governor fills Dr. Cubin's seat on the

47

Board with someone else, it will be difficult—if not impossible—to restore Dr. Cubin to his position. In *Schrier v. University of Colorado*, a plaintiff alleged that he was unlawfully terminated from his university department chair position in retaliation for his speech, and the Court concluded that he failed to show irreparable harm because he had not shown that "his removal as Chair during the time it [would] take to litigate this case [would] have an irreparable effect in the sense of making it difficult or impossible for him to resume his chairmanship . . . in the event he prevails." 427 F.3d 1253, 1267 (10th Cir. 2005). Here, by contrast, it is obvious that it will be "difficult or impossible" for Dr. Cubin to retake his position on the Board if he does not receive a preliminary injunction but ultimately prevails. His seat has remained vacant since his removal, but the Governor could fill it "at any time" absent a preliminary injunction. App. Vol. 2 at 287.

Finally, Governor Gordon himself maintains that sovereign immunity and qualified immunity bar Dr. Cubin from recovering monetary damages in this case. App. Vol. 1 at 41-42. Thus, by the

48

Governor's own account, Dr. Cubin has no adequate remedy at law, and injunctive relief is therefore the only relief available to him.

The third and fourth factors for a preliminary injunction—the balance of equities and the public interest—merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, a preliminary injunction restoring Dr. Cubin to the Board is in the public interest because the public interest always favors upholding First Amendment rights. *Pryor*, 99 F.4th at 1254.

Speech about public policy, such as Dr. Cubin's speech at issue here, is at the core of the First Amendment's protection. There is "a strong interest in debate on public issues," *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966), and "the law should encourage the private individual to become involved in and express his or her views on the conduct of government affairs." *Garcia v. Bd. of Educ.*, 777 F.2d 1403, 1410 (10th Cir. 1985).

### III. Governor Gordon is not entitled to qualified immunity for claims against him in his personal capacity.

The district court erred in finding that Governor Gordon is protected against claims in his personal capacity by qualified immunity. App. Vol. 1 at 265. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Singh v. Cordle*, 936 F.3d 1022, 1033 (10th Cir. 2019). The Supreme Court has said "'[w]e do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (citation omitted). To that end, the facts of *Pryor* illustrate a more extreme case than Dr. Cubin, where much more inflammatory speech by a public school employee was protected, underscoring that Dr. Cubin's comparatively mild speech as a government employee should certainly be protected. 99 F.4th at 1249, 1252.

The district court erred in finding that Dr. Cubin's "attempts to define clearly established law are far too general." App. Vol. 1 at 263. The district court characterizes Dr. Cubin's appeals to clearly established strong First Amendment protection as a sweeping pronouncement that does not provide fair notice. App. Vol. 1 at 263. But these are not sweeping generalizations about a clearly established right—rather, they are an accurate illustration of the strong protection enjoyed by political speech. While it is true that there are some limits on the First Amendment's free speech guarantee, the Supreme Court has emphasized the principle that the First Amendment receives strong protection, with the strongest level of protection for political speech. *See R.A.V. v. St. Paul*, 505 U.S. 377, 429 (1992) ("[The Supreme Court has] long recognized that when government regulates political speech or the expression of editorial opinion on matters of public importance, First Amendment protection is 'at its zenith.'").

Further, "[t]he First Amendment, our precedent makes plain, disfavors viewpoint-based discrimination." *Wood v. Moss*, 572 U.S. 744,

51

748 (2014) (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828 (1995)). In light of this longstanding principle, no reasonable government official could believe that viewpoint discrimination is permissible.

Yet Governor Gordon engaged in viewpoint discrimination when he removed Dr. Cubin from the Board in retaliation for expressing his political views on a medical issue—while allowing past Board member Rene Hinkle to remain on the Board (even reappointing her) after she expressed her own political views on a medical issue in direct testimony to the Wyoming legislature. App. Vol. 1 at 18. Both Dr. Cubin and Dr. Hinkle expressed their views on a politically-contentious medical issue to the legislature while serving on the Board. No explanation has been provided for why Governor Gordon did not have the same concerns about an appearance of bias from Dr. Hinkle's political advocacy.

In *Duda v. Elder*, the failure to neutrally apply a no-political-speech policy constituted viewpoint discrimination by the Sheriff against certain employees who were punished for supporting a political rival of

the Sheriff in contrast with the Sheriff's treatment of employees who engaged in political speech supporting the Sheriff while on duty. 7 F.4th 899, 915 (10th Cir. 2021). The same stark contrast is apparent in the differential treatment applied to the advocacy of Dr. Cubin and Dr. Hinkle. The only obvious difference between the Doctors' advocacy is their political party affiliation. Thus, the differential treatment of Dr. Cubin and Dr. Hinkle highlights Governor Gordon's impermissible viewpoint discrimination.

Finally, the district court analyzed the reasonableness of the Governor's belief that he was not violating a clearly established right by removing Dr. Cubin based on the Governor's post hoc rationalizations for terminating Dr. Cubin. App. Vol. 1 at 263. But the inquiry should be based on the Governor's actual stated reasons for Dr. Cubin's termination, contained in the termination letter, and ask whether a termination for those reasons would violate a clearly established right.

The district court wrongly concluded that Dr. Cubin's termination was based on the Governor's prediction that Dr. Cubin's email to

53

legislators could create a perception of bias against certain individuals—specifically, one particular doctor and leaders of the Wyoming Medical Society, who opposed Chloe's Law, and whom Dr. Cubin criticized in his email. That was not the basis of Dr. Cubin's termination stated in Governor Gordon's letter. Rather, Governor Gordon cited Dr. Cubin's comments *on the legislation* and the supposed appearance that Dr. Cubin was speaking on behalf of the Board.

There is no evidence in the record that Governor Gordon was aware of an email exchange between Dr. Cubin and Dr. Sanderson when he removed Dr. Cubin. In fact, Governor Gordon's letter terminating Dr. Cubin says that the Governor had "been made aware of [Dr. Cubin's] email to the members of the House of Representatives"—not that the Governor had been made aware of communications between Dr. Cubin and anyone else—making clear that the Governor's decision was based entirely on Dr. Cubin's email to legislators. App. Vol. 1 at 32. There is insufficient evidentiary support for the justifications stated in Governor

Gordon's letter terminating Dr. Cubin, making a prediction of disruption unreasonable.

Therefore, Governor Gordon should have been on notice that he would violate Dr. Cubin's clearly established right by terminating him for politically relevant speech without a reasonable prediction of disruption and qualified immunity does not protect him from these claims.

## IV. Governor Gordon is not entitled to immunity for claims against him in his official capacity.

Even if qualified immunity did protect Governor Gordon from claims in his personal capacity, the claims against Governor Gordon in his official capacity still apply. The *Ex parte Young* doctrine bypasses the Eleventh Amendment bar to official-capacity claims when a complaint against a state official alleges an ongoing violation of federal law and seeks prospective relief. *Ex parte Young*, 209 U.S. 123 (1908). The district court agreed that "the *Ex parte Young* doctrine applies in this

case to evade Eleventh Amendment immunity concerning the official-capacity claims against Governor Gordon." App. Vol. 1 at 250.

Dr. Cubin is suing Governor Gordon, a state official, seeking the prospective relief of reinstatement to the Board, and Dr. Cubin suffers the ongoing violation of being denied his previous position on the Board. App. Vol. 1 at 248-249. Therefore, even if this Court determines that qualified immunity protects Governor Gordon for claims in his personal capacity, judgment on the pleadings is inappropriate as to Dr. Cubin's prima facie case for First Amendment violations against Governor Gordon in his official capacity.

## V. Dr. Cubin's state constitutional claim should not be dismissed.

Because Dr. Cubin has established a prima facie case for First Amendment violations against Governor Gordon at least in his official capacity, the court need not dismiss the state claim. Dr. Cubin's federal constitutional claims are viable, granting supplemental jurisdiction over the state constitutional claim because it is so related to the federal

claims that form part of the same case or controversy under Article III of the Constitution. 28 U.S.C. § 1367. Therefore, the district court erred in dismissing Dr. Cubin's state constitutional claim.

## CONCLUSION

This Court should 1) reverse the district court's grant of judgment on the pleadings as to Counts I and II, 2) reverse the district court's dismissal of Count III, and, if it finds it appropriate, 3) reverse the district court's denial of a preliminary injunction and enter a preliminary injunction in favor of Plaintiff-Appellant, restoring him to the Wyoming Board of Medicine.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument because this case presents important and complex First Amendment issues.

Dated:  June 4, 2025

Respectfully submitted,

<u>/s/ Emily Rae</u>
Emily Rae
Bridget Conlan
LIBERTY JUSTICE CENTER
750 Rialto Blvd.
Suite 1-250
Austin, TX 78735
(512) 481-4400
erae@ljc.org
bconlan@ljc.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(g)(1) because it contains 9,844 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point proportionally spaced Century Schoolbook typeface using Microsoft Word for Mac.

Dated: June 4, 2025

/s/ Bridget Conlan

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing Brief of Appellant and the Appendix that:

1. All required privacy redactions have been made per 10th Cir. R. 25.5;

2. Only if requested by the Court, within five days of the request, hard copies of this Brief of Appellant and a copy the Appendix will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be exact copies of the version of the documents submitted electronically via the Court's ECF system;

3. The Brief of Appellant and Appendix have been scanned for viruses with AVG Antivirus Free for Mac 20.3 and no virus was detected.

<u>/s/ Bridget Conlan</u>

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I electronically filed the

foregoing Brief of Appellant and Appendix using the Court's CM/ECF

system. All participants in this case are registered CM/ECF users and

will be served by the Court's CM/ECF system.

<u>/s/ Bridget Conlan</u>

# ADDENDUM

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2025 APR 14  PM 3: 04

MARGARET BOTKINS, CLERK
CHEYENNE

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

DR. FREDERICK WILLIAM "ERIC" CUBIN III,

      Plaintiff,

    v.

MARK GORDON, in both his personal and
official capacities as Governor of Wyoming,

      Defendant.

Case No. 24-CV-164-SWS

---

## ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

---

     The Wyoming Board of Medicine (Board) is a state agency responsible for licensing and disciplining medical practitioners. *See* Wyo. Stat. §§ 33-26-201 *et seq.* Members of the Board are appointed by the Wyoming Governor with the consent of the Wyoming Senate, and they "serve at the pleasure of the governor." Wyo. Stat. § 33-26-201(a).

     Wyoming Governor Mark Gordon nominated Dr. Eric Cubin to a position on the Board, and Dr. Cubin was unanimously confirmed to the position by the Wyoming Senate. Dr. Cubin is also a voluntary member of the Wyoming Medical Society (WMS), a private, professional organization for Wyoming doctors that advocates on behalf of Wyoming doctors through legislative lobbying, public outreach, and other methods.

     In February 2024, Dr. Cubin sent an email to the entire Wyoming House of Representatives expressing his support for a bill then under consideration. Dr. Cubin's email was not limited to voicing his position on the bill, though. It also informed the Wyoming House of his dispute with WMS and its current leadership because WMS had expressed opposition to the

Add.001

same bill. Dr. Cubin asserted WMS had "been essentially hijacked by the far left." Dr. Cubin continued by alleging a specific doctor, "presumably" in conjunction with WMS leadership, "ignored and suppressed" relevant information contrary to WMS' public position on the bill.

The bill eventually passed both chambers of the Wyoming Legislature and was signed into law by Governor Gordon. In late April 2024, though, Governor Gordon removed Dr. Cubin from the Board, informing Dr. Cubin that his comments in his email could cause certain doctors who may have to appear before the Board with their medical license and livelihood on the line to question the impartiality and fairness of the Board proceeding.

Dr. Cubin then filed suit, asserting Governor Gordon had unlawfully retaliated against him for exercising his First Amendment rights to free speech and to petition the government, and he asserts a similar claim under the Wyoming State Constitution. (ECF 1.) He seeks to be restored to his position on the Board and the recovery of monetary damages. (ECF 1 p. 18.)

Governor Gordon now asks for judgment on the pleadings against Dr. Cubin's two federal claims and the dismissal of his state-law claim. (ECF 26, 27.) Dr. Cubin filed an opposition to the motion (ECF 38), and Governor Gordon replied (ECF 42). Having considered the parties' arguments and reviewed the record herein, the Court finds and concludes the request for judgment on the pleadings is well taken and should be granted.

### STANDARD OF ADJUDICATION FOR JUDGMENT ON THE PLEADINGS

Once the pleadings are closed, Federal Rule of Civil Procedure 12(c) allows a party to seek judgment based on the pleadings so long as it is early enough not to delay trial. Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019) (quoting *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000)). The

Court's function when considering a Rule 12(b)(6) or Rule 12(c) motion "is not to weigh potential evidence that the parties might present at trial." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). Instead, the Court examines the legal sufficiency of the complaint, and the motion should be granted "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief, accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff." *Id.* (quoting *Yoder v. Honeywell, Inc.*, 104 F.3d 1215, 1224 (10th Cir. 1997)). To overcome a Rule 12(b)(6) or Rule 12(c) motion, a complaint's factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While the Court accepts the nonmoving party's well-pled factual allegations as true, it is not bound to accept an asserted legal conclusion as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

## THE COMPLAINT'S ALLEGATIONS

Plaintiff Eric Cubin is a licensed physician who resides and works in Wyoming. (Compl. ¶ 8.[1]) Defendant Mark Gordon is the Governor of Wyoming. (*Id.* ¶ 9.)

The Wyoming Board of Medicine is a statutorily-created state agency "responsible for issuing and renewing licenses for physicians and other medical practitioners in Wyoming." (*Id.* ¶ 13 (citing Wyo. Stat. Ann. § 33-26-202).)

> The Board oversees medical regulation, compliance, and discipline. Its duties include ensuring that physicians adhere to state laws governing medical practice, investigating complaints against medical professionals, conducting hearings, and taking disciplinary actions such as revoking or suspending medical licenses.

---

[1] ECF 1

(*Id.* ¶ 14 (citing Wyo. Stat. Ann. § 33-26-202).) The Board typically consists of eight members, five of which are physicians. (*Id.* ¶ 15.) Board members are appointed by the Governor of Wyoming with the advice and consent of the State senate, and they "serve at the pleasure of the governor." (*Id.* ¶¶ 17-18.) Board members (typically) serve four-year terms, and they are paid for their services in the same manner and amounts as members of the Wyoming Legislature. (*Id.* ¶¶ 16, 19.) Governor Gordon appointed Dr. Cubin to the Board for a four-year term in or around February 2024. (*Id.* ¶¶ 20-21.)

The Wyoming Medical Society (WMS) is a professional organization with its stated goal of serving the interests of Wyoming medical practitioners. (*Id.* ¶ 29.) Joining WMS is voluntary; medical practitioners need not join the organization. (*Id.* ¶ 28.) Dr. Cubin was a voluntary member of WMS. (*Id.* ¶ 30.)

1.    <u>**Senate File 0099 and Dr. Cubin's Emails**</u>

In February 2024, the Wyoming Legislature considered Senate File 0099, a bill also known as "Chloe's Law,"[2] "which would prohibit certain gender-affirming procedures for minors in Wyoming." (*Id.* ¶ 22.) WMS "publicly opposed Chloe's Law." (*Id.* ¶ 27.) Dr. Cubin, however, personally favored the bill and disagreed with WMS's public opposition to the bill. (*Id.* ¶ 30.)

On February 21, 2024, Dr. Cubin emailed WMS's executive director to express "his concerns about WMS's position on Chloe's Law." (*Id.* ¶ 31.) "Dr. Cubin thought it unlikely that WMS's stance reflected views of the vast majority of its members, and asked whether WMS could present physicians' views on both sides of the issue regarding Chloe's Law." (*Id.* ¶ 32.)

---

[2]  This refers to Chloe Cole, an activist from California who opposes gender transition surgeries and treatments after she received transgender surgeries and treatments as a minor and thereafter "detransitioned" because she later regretted her attempts to transition from being a girl to a boy. (*See* ECF 1 ¶¶ 22-26 and footnotes therein.)

The next day, the executive director responded to explain WMS's position but did not address

Dr. Cubin's "request for a more balanced presentation on Chloe's Law." (*Id.* ¶ 33.) And the day

after that, the President of the WMS Board of Trustees emailed Dr. Cubin to reiterate WMS's

position but also failed to respond to the concern that WMS did not fairly represent Wyoming's

physicians on the matter. (*Id.* ¶ 34.)

On February 25, 2024, Dr. Cubin emailed the WMS Board to express his disagreement

with WMS's position on Chloe's Law and request that WMS poll its physician members on the

issue. (*Id.* ¶ 35.) Further email exchanges with WMS leadership followed, with Dr. Cubin

requesting "WMS adjust its position to a more neutral stance" on Senate File 0099. (*Id.* ¶ 36.)

> On February 28, 2024, after receiving no satisfactory response from WMS
> leadership, Dr. Cubin sent an email from his personal email account to the entire
> Wyoming House of Representatives expressing his personal views in support of
> Chloe's Law and criticizing WMS's position against it.

(*Id.* ¶ 37.) That email stated in full:

> My name is Eric Cubin. I am a physician in Casper. I am writing you today for a
> couple reasons. This email was originally written with the intent of sending it to
> the cosponsors of SF 99, Chloe's law. After considering it for some time, I've
> decided to expand the audience to the entire House of Representatives because I
> think you all need to know what is happening.
>
> First and foremost, I want to say thank you. Thank you for spending your time
> and energy in an effort to keep Wyoming the last great place!
>
> Second, I'm writing you because of SF 99, Chloe's Law. There is a situation that
> has arisen that I want to make you aware of. In addition, I would like to present
> each of you with some information that you may not otherwise be provided.
>
> It saddens me very much to have to report that, under their current leadership, the
> Wyoming Medical Society has been essentially hijacked by the far left. It seems
> that they have decided to prioritize politics over their stated mission of physician
> advocacy. In my opinion, they have adopted and embraced "woke" positions that
> are not congruent with the thoughts and opinions of the majority of their
> physician members. In essence, I have lost all confidence in their ability or desire
> to faithfully represent the physicians in this state.

Please allow me to give you an example. WMS seems to have teamed up with the American Association of Pediatricians in opposing SF 99. Quite frankly, I refuse to believe that the majority of physicians in this very conservative state agree with this position - and we were never polled. This position was established by several very vocal, extremely liberal members of the Board. The position was then made public as though it actually represents the thoughts and beliefs of physicians in Wyoming when, in fact, that is probably not true.

In their opposition to Chloe's Law, the WMS has partnered with Dr. Sanderson, a pediatrician from Sheridan, who is the President of the WyAAP. Dr. Sanderson has effectively delivered the position of his organization but he has failed to tell you that there is another pediatric professional society that has taken an opposite position, the American College of Pediatricians (ACP). It turns out, the ACP put out a position statement that was revised February 5th, 2024, which reads in part:

"The ACPeds cannot condone the social affirmation, medical intervention, or surgical mutilation of children and adolescents identifying as transgender or gender nonconforming."

You can find the full text to their position statement at:

https://acpeds.org/position-statements/mental-health-in-adolescents-with-incongruence-of-gender-identity-andbiological-sex

The ACP created another germane position statement in 2018 which is worth reviewing and can be found at:

https://acpeds.org/position-statements/gender-dysphoria-in-children

You need to know that Dr. Sanderson (and presumably the WMS leadership) were aware of these ACP positions and yet they were ignored and suppressed when the WMS position was established. Further, I presume that you have only been provided with the WMS/AAP position and not the ACP position statements. As I have communicated to the entire WMS Board, it is not acceptable to only present one side of an issue in an effort to effect change in social policy.

For further illustration of the WMS's embracing of the woke transgender movement, I would also invite you to look at their Spring 2023 issue of "Wyoming Medicine" magazine. In this particular issue they feature "Gender Affirming Care" on the cover and in a feature article. I have no idea why the WMS has elected to take this unnecessary position that is so clearly contrary to the viewpoint of the majority of their members.

You can find the Spring 2023 edition of "Wyoming Medicine" here:

https://www.wyomed.org/wp-content/uploads/2023/05/23-WMS-

Add.006

0012_Spring2023_digital.pdf

I want to be very clear that the WMS membership was never polled on their opinions of "Gender Affirming Care" even though I have implored the leadership to do so. It feels very much like the leadership at WMS has inserted their opinions in hopes that the WMS membership would not notice or speak up.

At this point, the strongest argument that I've heard in favor of killing this bill, as Dr. Sanderson referred to in his Senate testimony, is that the legislature should not do anything to interfere with the doctor patient relationship. At face value, I agree with that wholeheartedly. That being said, there are some instances in which, for the safety of the public, it would be completely appropriate and reasonable for the legislature to make rules governing what is and is not acceptable in our society. For example, if a physician moved into our state and started performing physician-assisted suicide, should that be allowed because it falls under the doctor-patient relationship?

Another example that I would offer for your consideration is that of child abuse. All physicians are legally and morally required to report any instance in which we suspect child abuse. Why? Is that government overreach? Does that violate the doctor patient relationship? Obviously, we all do that to protect our youth. "Gender affirming care" with the use of puberty blockers and hormones in a patient with normal physiology takes a patient who is normal and makes them abnormal. How can that be viewed as anything but harmful? This is particularly true in young people who are impressionable and whose brains have not developed sufficiently to make decisions such as these - and it will likely have negative effects on them later in life. When it comes to gender affirming care in children, we can protect them by not allowing them to engage in it.

I think it is important for you to know that I have aggressively tried to address this situation with the WMS Board over the last couple days. I was given an assurance earlier today that the WMS Board will be holding an executive session of some kind to determine if they will be changing their position from opposing this bill to a neutral position. At this time, I have not been given any assurance that the WMS will be changing their position, so I feel the need to advocate on my own behalf by coming to you directly with this information. It is entirely possible that when this bill is considered in committee and on the floor that the WMS position may have been changed to neutral. Up to this point, however, they have not changed their position to neutral.

From the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born, I can tell you that this is a good bill. Please do not kill it, combine it, or amend it into oblivion. This is very clearly an instance where it is completely appropriate and reasonable for all of you to stand up and say "we don't do that here".

> Thank you again for all that you are doing for the citizens of Wyoming and for considering my concerns. I hope that you find the information presented above helpful in promoting and passing SF 99. Please feel free to reach out to me if you have any questions or concerns.
>
> God Bless,
> Eric Cubin MD, MS

(Compl. Ex. 1.) "Dr. Cubin did not claim in his email to be speaking on behalf of the" Wyoming

Board of Medicine. (Compl. ¶ 40.)

Senate File 0099, "Chloe's Law," was passed by the Wyoming Legislature and signed

into law by Governor Gordon. (*Id.* ¶ 43.)

**2.    Dr. Cubin's Removal from the Board of Medicine**

On April 22, 2024, not quite two months after Dr. Cubin's email to the Wyoming House

of Representatives, "Governor Gordon sent a letter to Dr. Cubin stating that Gordon was

removing Cubin from the Wyoming Board of Medicine." (Compl. ¶ 44.) In that removal letter,

Governor Gordon wrote the following:

> I have been made aware of your email to the members of the House of Representatives during this last legislative session regarding SF0099 in which you strongly encouraged the members to pass this legislation and criticized the Wyoming Medical Society's opposition to the bill. I certainly appreciate your position on this issue and respect your right to impart it to the Legislature. Nonetheless, no matter what anyone's personal expressed beliefs may be, it is important that the professionals governed by the Board of Medicine have confidence that board members prosecute their responsibilities on the board in an objective and unbiased way. I believe your comments on this particular legislation could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice. Medical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone. Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality.
>
> I am certain you would understand that while you certainly are entitled to your First Amendment right to free speech, as an individual member of the Board, you would not be entitled to speak for the Board unilaterally. Nevertheless, some may not appreciate that your personal comments might not necessarily

be those of the Board as a whole. It has never been my intention to inhibit your own ability to express your views unabashedly or to confuse anyone's personal opinions and beliefs with those of any of our boards. Therefore, as I have done before, when a member of a board chooses to express personal beliefs in a way that can be construed as speaking for the body, I have elected to relieve that member of the constraints board membership requires.

Therefore, in this instance, sadly, I believe it is best to remove you from the Board of Medicine. I wish you all the best in your future endeavors and urge you to continue to advocate for your beliefs.

(Compl. Ex. 2.)

"After being forced by Governor Gordon to resign from the Board, Dr. Cubin verbally resigned, which Governor Gordon accepted and made effective as of April 22, 2024, the same day as Gordon's letter to Dr. Cubin removing him from the Board." (Compl. ¶ 56; Compl. Ex. 3.)

Four months later, Dr. Cubin filed this lawsuit against Governor Gordon, suing the Governor in both his official and individual capacities.

## DISCUSSION

Dr. Cubin alleges two claims under federal law and one under state law. In his Count One and Count Two, Dr. Cubin sues Governor Gordon under 42 U.S.C. § 1983, alleging Governor Gordon unlawfully retaliated against him for exercising his First Amendment rights of free speech and petition. In Count Three, Dr. Cubin contends Governor Gordon violated those same rights under the Wyoming State Constitution. He seeks to be restored to his position on the Wyoming Board of Medicine and an award of money damages.

Governor Gordon asks that judgment on the pleadings be entered in his favor. He contends the complaint fails to allege a violation of Dr. Cubin's federal constitutional rights. He further asserts he is protected from Dr. Cubin's claims in his official capacity by Eleventh Amendment immunity and in his individual capacity by qualified immunity. The Court begins

with a preliminary matter concerning its continued jurisdiction in the face of Dr. Cubin's pending interlocutory appeal.

**1.**      **District Court's Continued Jurisdiction During Interlocutory Appeal**

The Court previously denied Dr. Cubin's request for a preliminary injunction to restore him to a position on the Board while this lawsuit proceeded, and Dr. Cubin is currently pursuing an interlocutory appeal from that decision. (ECF 25, 34, 36.) Generally, whenever an appeal is taken, including most interlocutory appeals, the district court is divested of jurisdiction over matters integral to the appeal, and such jurisdiction is transferred to the appellate court while the district court retains jurisdiction only over matters collateral to (not directly involved in) the appeal. *Stewart v. Donges*, 915 F.2d 572, 575-76 (10th Cir. 1990).

However, interlocutory injunction appeals often operate slightly differently. "Ordinarily an interlocutory injunction appeal under 1292(a)(1) does not defeat the power of the trial court to proceed further with the case." *Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 791–92 (10th Cir. 2013) (quoting 16 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 3921.2).

> Interlocutory injunction appeals would come at high cost if the trial court were required to suspend proceedings pending disposition of the appeal. The delay and disruption alone would be costly. As importantly, cases involving injunctive relief are apt to present an urgent need for action. An injunction can seriously disrupt the affairs of those bound by it. Denial of an injunction can destroy the capacity to grant effective relief after trial. Continuing trial court proceedings, moreover, often pose little threat to orderly disposition of the appeal; ordinarily the scope of the appeal will be limited to consideration of the preliminary injunction decision itself, despite the power to reach out to other matters.

*Pueblo of Pojoaque v. State*, 233 F. Supp. 3d 1021, 1087–88 (D.N.M. 2017) (emphasis added) (quoting Wright & Miller § 3921.2).

Here, the Court concludes it retains jurisdiction to decide Governor Gordon's 12(c)

motion for judgment on the pleadings despite the pending interlocutory injunction appeal for two reasons. First, because the Court accepts well-pled factual allegations as true in this motion, there are no factual determinations to be made in deciding the 12(c) motion. Second, the Tenth Circuit has held the district court retains jurisdiction during an interlocutory injunction appeal to dismiss under Rule 12(b)(6) for failure to state a claim, *Free Speech*, 720 F.3d at 792, and the standard of adjudication and analysis for this Rule 12(c) motion will be identical to that of a Rule 12(b)(6) motion.[3] The Court thus proceeds to the merits of the motion for judgment on the pleadings.

## 2.    Eleventh Amendment Immunity and *Ex Parte Young* as to Official-Capacity Claims

The Court next turns to Governor Gordon's assertion of Eleventh Amendment immunity (ECF 27 pp. 16-18) because if it applies, the Court lacks subject-matter jurisdiction over the official-capacity claims. *See Fowler v. Stitt*, 104 F.4th 770, 782 (10th Cir. 2024) ("[i]f Eleventh Amendment immunity applies [and is not waived], the federal courts do not have jurisdiction"); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (Eleventh Amendment immunity "constitutes a bar to the exercise of federal subject matter jurisdiction").

The Eleventh Amendment generally "bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams*, 928 F.3d at 1212. Dr. Cubin contends his official-capacity claims bypass the Eleventh Amendment bar based on the *Ex parte Young* doctrine, established in the case of *Ex parte Young*, 209 U.S. 123 (1908). "Although not properly characterized as an exception to a state's Eleventh Amendment immunity, the doctrine allows for

---

[3] Dr. Cubin contends Governor Gordon's answer disputes many factual allegations, which makes any judgment on the pleadings improper based on the disputes of fact. (ECF 38 pp. 5-6.) While this argument may be more consistent with the plain language of Rule 12(c), i.e., "judgment on the pleadings" where an answer is a "pleading," Tenth Circuit law makes clear that the complaint's well-pled factual allegations are accepted as true for Rule 12(c) motions without reference to whether the opposing party challenges those factual allegations. *See Zevallos v. Allstate Prop. & Cas. Co.*, 776 F. App'x 559, 561 n.1 (10th Cir. 2019) (noting it was "not proper in resolving a motion under Rule 12(c)" for the district court to consider a settlement agreement attached to the defendant's answer that was not central to the plaintiff's complaint).

suits against state officials under certain circumstances." *Reyes v. First Jud. Dist. Attorney's Off.*, 497 F. Supp. 3d 994, 1001 (D.N.M. 2020).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks and citations omitted). "Thus, for the *Ex parte Young* exception to apply, Plaintiffs must show that they are: (1) suing state officials rather than the state itself, (2) alleging an ongoing violation of federal law, and (3) seeking prospective relief." *Reyes*, 497 F. Supp. 3d at 1001. In examining whether *Ex parte Young* applies to evade Eleventh Amendment immunity, the Court does not analyze the actual merits of the claim. *Fowler v. Stitt*, 104 F.4th 770, 782 (10th Cir. 2024).

Dr. Cubin readily satisfies the first and third requirements under *Ex parte Young*. He is suing Governor Gordon for having removed him from the Board; Dr. Cubin is not suing the State of Wyoming itself. And in his official-capacity claims, he seeks the prospective relief of reinstatement to the Board. The dispute comes down to whether Dr. Cubin has alleged an ongoing, rather than a completed, violation of federal law.

It appears the Tenth Circuit has never expressly determined whether the removal of a public employee from their position in alleged violation of federal law constitutes an "ongoing violation." However, by analogy to a Tenth Circuit case, the Court finds such an allegation to satisfy the second *Ex parte Young* requirement. In *Rounds v. Clements*, 495 F. App'x 938 (10th Cir. 2012), Mr. Rounds, a state prisoner and an electrician by trade, was allowed to perform electrical jobs inside the prison facility and enjoyed several related privileges. *Id.* at 939.

However, when certain prison officials allegedly instructed him to engage in cheap, inferior electrical work in violation of the state code, he refused and complained. In response, prison officials allegedly retaliated against him by transferring him to a less desirable facility with the loss of his electrician-related privileges. *Id.* Like Dr. Cubin here, Mr. Rounds alleged he was "being retaliated against for exercising his free speech rights, all in violation of the First Amendment and actionable under 42 U.S.C. § 1983." *Id.*

> In his appeal, [Executive Director of the Colorado Department of Corrections] Mr. Clements argues that we should grant him immunity from suit because, contrary to the district court's ruling, he hasn't participated in any ongoing violation of federal law as required by *Ex parte Young*. The problem with this argument is that Mr. Rounds's operative complaint alleges that he is currently, on an ongoing basis, being denied his previous prison placement and many other privileges in retaliation for exercising his First Amendment rights. Aplt.App. at 134 ¶ 29. And there is no dispute Mr. Rounds added Mr. Clements to the suit because Mr. Clements alone has the power to undo this state of affairs, *see* Aplt. Br. at 8 (acknowledging this), something Mr. Clements has so far declined to do. As remedy, Mr. Rounds seeks only a prospective injunction forcing Mr. Clements to restore the privileges he has not chosen to restore voluntarily. Aplt.App. at 134 ¶ 36, 135 ¶ A. Drawing the reasonable inference in Mr. Rounds's favor—as we must at this, the motion to dismiss stage, *see United States v. Rodriguez–Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001)—it is plain enough Mr. Rounds alleges that Mr. Clements is currently participating in an ongoing scheme to deny him (Mr. Rounds) a prison placement and privileges that he once enjoyed, all in retaliation for exercising his First Amendment rights.

*Id.* at 940.

Like the plaintiff in *Rounds*, Dr. Cubin here complains that "he is currently, on an ongoing basis, being denied his previous" position on the Board in violation of his First Amendment protections and that Governor Gordon is the official capable of restoring him to the Board. Accordingly, at least for purposes of the current motion, the Court finds Dr. Cubin has alleged an ongoing violation of federal law sufficient to satisfy the *Ex parte Young* doctrine. *See Klaassen v. Univ. of Kansas Sch. of Med.*, 84 F. Supp. 3d 1228, 1245–46 (D. Kan. 2015) ("[P]laintiff's Second Amended Complaint alleges that he is currently, on an ongoing basis,

being denied his position as a tenured professor at KUMC, in violation of his First Amendment and due process rights. These allegations plead sufficient facts of an ongoing violation of federal law to survive a motion for judgment on the pleadings in the Tenth Circuit.") (citing *Rounds*, 495 F. App'x at 940), *clarified on denial of reconsideration*, No. 13-CV-2561-DDC-KGS, 2015 WL 2400773 (D. Kan. May 15, 2015).

The Court's "straightforward inquiry" into Dr. Cubin's complaint finds it "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md.*, 535 U.S. at 645. Consequently, the Court determines the *Ex parte Young* doctrine applies in this case to evade Eleventh Amendment immunity concerning the official-capacity claims against Governor Gordon, and therefore the Eleventh Amendment does not strip the Court of subject-matter jurisdiction over the official-capacity claims.

**3.      Failure to Allege a Plausible First Amendment Violation**

Governor Gordon contends Dr. Cubin's Counts One and Two fail to state a viable claim on which relief can be granted because the complaint does not set forth unlawful retaliation for Dr. Cubin's exercise of his First Amendment rights. (ECF 27 pp. 5-16.)

Dr. Cubin's government service on the Board and government compensation rendered him a public employee. "As applied to the states by the Fourteenth Amendment, the First Amendment prevents state and local governments from 'condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Duda v. Elder*, 7 F.4th 899, 910 (10th Cir. 2021) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," but the First Amendment continues to protect "a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public

concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 418 (2006). "The government employer, however, also has a 'countervailing interest in controlling the operation of its workplaces.'" *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014)). "Thus, a public employer's legitimate needs and interests may justify some limitations on the speech of employees." *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 594 (10th Cir. 1994), *overruled on other grounds by Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1194-97 (10th Cir. 1998).

"The government has a substantial interest in ensuring that all of its operations are efficient and effective." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011). When public employees "speak out, they can express views that contravene governmental policies or impair the performance of governmental functions." *Garcetti*, 547 U.S. at 419. "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Knopf*, 884 F.3d at 944 (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). "To determine if an employer's adverse employment action against an employee is an impermissible retaliation under the First Amendment, we apply the *Garcetti/Pickering* test." *Id.* at 945. The *Garcetti/Pickering* analysis comprises five inquiries:

(1)   whether the speech was made pursuant to an employee's official duties;

(2)   whether the speech was on a matter of public concern;

(3)   whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;

(4)   whether the protected speech was a motivating factor in the adverse employment action; and

(5)   whether the defendant would have reached the same employment decision
in the absence of the protected conduct.

*Id.* (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014)). "The first three inquiries are ordinarily matters of law for the court to decide, while the last two are for the factfinder." *Fields v. City of Tulsa*, 753 F.3d 1000, 1014 (10th Cir. 2014) (citing *Deutsch v. Jordan*, 618 F.3d 1093, 1098 (10th Cir. 2010)). "Under this analysis, a public employee's speech is unprotected if it was made pursuant to official duties, if it was not on a matter of public concern, or if the balance of interests favors the employer." *Id.* (citing *Deutsch*, 618 F.3d at 1097-98).

The *Garcetti/Pickering* test applies to Dr. Cubin's free-speech claim as well as his right-to-petition claim. *See Guarnieri*, 564 U.S. at 398 ("The framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right."); *Fields*, 753 F.3d at 1013 n.1 (noting the *Garcetti/Pickering* analysis "would be the same" whether under the Free Speech clause or the Petition clause); *Morris v. City of Colorado Springs*, 666 F.3d 654, 660-61 (10th Cir. 2012) (noting the *Garcetti/Pickering* analysis applies to both free-speech and right-to-petition claims).

For purposes of this motion for judgment on the pleadings, Governor Gordon focuses on the second and third steps, contending Dr. Cubin's speech was not a matter of public concern and the balance of interests favors the government employer. (ECF 27 pp. 6-16.)

### 3.1   **Matter of Public Concern**

"Matters of public concern are 'those of interest to the community, whether for social, political, or other reasons.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)).

In determining whether speech pertains to a matter of public concern, the court may consider "the motive of the speaker and whether the speech is calculated to

> disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." [*Lighton*, 209 F.3d at 1224]. Statements revealing official impropriety usually involve matters of public concern. *Id.* Conversely, speech that simply airs "grievances of a purely personal nature" typically does not involve matters of public concern. *Id.* at 1225. In deciding what is a matter of public concern, we are required to consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

*Id.* For purposes of example, the Tenth Circuit has held the following matters are not of public concern: "speech regarding grievances about internal departmental affairs, disputes over the term of employment, and workplace frustration." *Id.* (internal citations omitted).

Dr. Cubin attempts to frame his complaint as a dispute over his personal support of Senate File 0099, "Chloe's Law." It is uncontested that Dr. Cubin spoke as a citizen on a public matter when he expressed his support for the bill then under consideration. However, from the view of the *Garcetti/Pickering* analysis, the issue with Dr. Cubin's email to the Wyoming House of Representatives is not his expression of support for Senate File 0099; it is the public airing of his dispute with Wyoming Medical Society's leadership. Governor Gordon even referenced Dr. Cubin's extraneous comments in the removal letter, noting the Dr. Cubin had "strongly encouraged the members to pass this legislation **and criticized the Wyoming Medical Society's opposition to the bill**." (Compl. Ex. 2 (emphasis added).)

WMS is a private organization of which Dr. Cubin was a voluntary member. (Compl. ¶¶ 28, 30.) Dr. Cubin's email expressed his personal dispute and frustrations with WMS. His own words make that much clear:

> It saddens me very much to have to report that, under their current leadership, the Wyoming Medical Society has been essentially hijacked by the far left. It seems that they have decided to prioritize politics over their stated mission of physician advocacy. In my opinion, they have adopted and embraced "woke" positions that are not congruent with the thoughts and opinions of the majority of their physician members. In essence, I have lost all confidence in their ability or desire to faithfully represent the physicians in this state.

(Compl. Ex. 1.) Dr. Cubin's concerns may have been extremely relevant to WMS and its other members, but WMS is a private organization with the "stated mission of physician advocacy," which is not a matter of general concern for the vast majority of the public who are not physicians or other medical professionals. Dr. Cubin's statement that he had "lost all confidence" in WMS's leadership to pursue its mission highlights the fact that this was his personal concern about a private organization.

Dr. Cubin asserts, "WMS's failure to poll and accurately represent its members' views in its presentation regarding a piece of legislation is a matter of public concern." (ECF 38 p. 10.) Not so. This only shows Dr. Cubin's personal dispute with how WMS was internally operating.

Dr. Cubin relies on *Pryor v. School District No. 1*, 99 F.4th 1243 (10th Cir. 2024), to advance his assertion that his criticisms of WMS concerned the public, but *Pryor* does not provide the shelter Dr. Cubin seeks. In *Pryor*, the Tenth Circuit noted, "Even if personal grievances partially motivate speech, the speech still involves matters of public concern when it reveals official wrongdoings because this interests the public." *Id.* at 1252. And the plaintiff in *Pryor* "expressed that he intended to expose wrongdoing in the local school board and school administration." *Id.* Big difference here. Dr. Cubin's complaints about WMS's leadership and activities did not "reveal[] official wrongdoings." It revealed that an advocacy association with which Dr. Cubin voluntarily associated himself was not advocating in a manner approved by him. Even in the current bipartisan environment in which this nation finds itself entrenched, it cannot be said that expressing disagreement with a private organization's operations and positions "disclose[s] misconduct" or "reveals official wrongdoings." *Pryor* does not support Dr. Cubin's claim that his WMS criticism was a matter of public concern.

The Court has no doubt Dr. Cubin's concerns about WMS's leadership and activities

were genuine, but his "criticism[] of the [WMS] Board" is "clearly not [a] matter[] of public concern because it is 'internal in scope and personal in nature.'" *Brammer-Hoelter*, 492 F.3d at 1206 (quoting *Bunger v. Univ. of Okla.*, 95 F.3d 987, 992 (10th Cir. 1996)). His comments about his ongoing dispute with WMS were unnecessary and extraneous to his support of Senate File 0099. Accepting the factual allegations in the complaint as true, Dr. Cubin's grievance about WMS was a matter of personal interest not protected by the First Amendment. Consequently, Dr. Cubin's claims of First Amendment retaliation (Counts One and Two) fail to state claims on which relief can be granted. *See Morris*, 666 F.3d at 663 n.5 (noting that the Court "need not address any other prong" after dismissal on the second prong of the *Garcietti/Pickering* test).

### 3.2    Balance of Interests

Even if Dr. Cubin's complaint plausibly showed his assertions about WMS concerned the public, the balance of interests weighs in Governor Gordon's favor of promoting efficiency.

The third element of the *Garcetti/Pickering* test asks whether the government employer's interests in promoting and ensuring efficient public service outweigh the public employee's First Amendment interests. "The only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships." *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1222 (10th Cir. 2017) (cleaned up) (emphasis in original) (quoting *Trant*, 754 F.3d at 1166). "[T]he manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

> Pertinent factors to consider include whether the statement: "[1] impairs discipline by superiors or harmony among coworkers, [2] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or [3] impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

*Helget*, 844 F.3d at 1222 (quoting *Rankin*, 483 U.S. at 388).

### 3.2.1 "Long After" Versus "Soon After"

"In analyzing the employer's interest in avoiding disruption, different standards apply depending on whether the adverse employment action occurred 'long after' or 'soon after' the employee's protected speech." *Duda*, 7 F.4th at 912. If the adverse employment action occurs "long after" the public employee's speech, then the government employer must prove the speech actually disrupted its operations in order to outweigh the employee's First Amendment interests. *Id.* at 912-13; *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1280 (10th Cir. 2007) ("once a sufficient time has passed, the government employer may satisfy its burden only by showing specific evidence of actual disruption"). In contrast, when the adverse employment action is taken "soon after" the subject speech, there is no requirement that the government employer show the employee's speech caused an actual disruption to government operations and instead can rely on a reasonable prediction of disruption. *Duda*, 7 F.4th at 913; *Deschenie*, 473 F.3d at 1279 (where the adverse employment action is taken "soon after" the speech, a court will generally defer to the employer's reasonable predictions of disruption that are supported by specific evidence).

Here, Dr. Cubin sent his email to the Wyoming House of Representatives on February 28, 2024 (Compl. Ex. 1), and Governor Gordon removed him from the Board on April 22, 2024 (Compl. Ex. 2), a period of slightly less than two months. The Tenth Circuit has not fixed a time limitation for separating "soon after" from "long after." *Duda*, 7 F.4th at 913 n.10; *see Deschenie*, 473 F.3d at 1279 ("When the adverse employment action takes place several months after the employee's speech, however, it is no longer reasonable for the government to rely on predictions of disruption which did not materialize."). The Tenth Circuit has determined, though,

that six months with no actual disruption is "long after" the subject speech, and such a length of time precludes any "prediction" of disruption weighing in the government employer's favor. *Id.* (citing *Kent v. Martin*, 252 F.3d 1141, 1146 (10th Cir. 2001)). Similarly, the Tenth Circuit has said that adverse employment action taken within one month of the subject speech falls on the "soon after" side of the line, allowing the government employer to rely on its prediction of disruption. *Deschenie*, 473 F.3d at 1280-81. But where the line actually rests between "soon after" and "long after" remains undefined.

Accepting the complaint's factual allegations as true, and specific to this case, the Court concludes Governor Gordon's action occurred "soon after" Dr. Cubin's email to the Wyoming House for two reasons. First, the slightly less than two months in this case is not anywhere near the timeframes considered by the Tenth Circuit to be clearly "long after;" it is far closer to *Deschenie's* one month (which was "soon after") than to *Kent's* six months (which was "long after"); and it is less than the "several months" referenced in *Deschenie*. Second, particular to the circumstances here, the Court considers it significant that Dr. Cubin's work on the Board was not day-to-day but was rather sporadic, thus making any opportunity for his email to disrupt the Board's work rather sporadic as well. In a more traditional employment context, the opportunity for an employee's speech to disrupt the functioning of their employment is far more frequent, and likely more immediate, than the occasional work done by the Board members. Thus, the Court considers Dr. Cubin's removal from the Board to have occurred "soon after" his subject speech.[4] Consequently, "we do not require a government employer to allow the disruption to manifest before acting." *Bailey v. Indep. Sch. Dist. No. 69 of Canadian Cnty. Oklahoma*, 896

---

[4] Governor Gordon did not state the date on which he learned of Dr. Cubin's email to the House members. His April 22, 2024 removal letter noted that he had "been made aware of your email to the members of the House of Representatives during this last legislative session . . .." (Compl. Ex. 2.)

F.3d 1176, 1183 (10th Cir. 2018). "Instead, when the employer's intent in taking an adverse action is to avoid actual disruption, we will generally defer to a public employer's reasonable predictions of disruption, as long as the predictions are supported by specific evidence." *Duda*, 7 F.4th at 913 (internal citations and quotations omitted).

### 3.2.2    Governor's Significant Interest in Avoiding Disruption to the Board's Work

When a Board member sits in judgment of a licensee, they of course owe the licensee a fair and impartial consideration of the matter, but they also owe the appearance of fairness and impartiality. "Due process requires that an agency provide a fair trial without the appearance of bias or prejudice." *Painter v. Abels*, 998 P.2d 931, 938 (Wyo. 2000). In an agency's action in a licensing matter, "[f]undamental considerations require not just fairness in fact but also fairness in appearance." *Dorr v. Wyo. Bd. of Certified Public Accountants*, 21 P.3d 735, 745 (Wyo. 2001). "It is clearly established law that '[m]aintaining the appearance of impartiality of the judiciary is an interest of vital importance.'" *Stengle v. Office of Dispute Resolution*, 631 F. Supp. 2d 564, 575 (M.D. Pa. 2009) (quoting *Kirchgessner v. Wilentz*, 884 F. Supp. 901, 912 (D.N.J. 1995)); *see U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers*, 413 U.S. 548, 565 (1973) ("it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent"). "[T]he maintenance of [Dr. Cubin's] impartiality, and appearance thereof, was crucial to the effective operation of" the Board, particularly because one of the primary duties of Board members is to sit as arbiters over complaints against other medical providers. *See Stengle*, 631 F. Supp. 2d at 576. Governor Gordon accurately stated in his removal letter to Dr. Cubin: "Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality."

(ECF 1-2 p. 2.) The Court has little difficulty concluding that Governor Gordon has a significant interest in assuring members of the Board can perform their Board functions without perceived or actual bias or prejudice.

### 3.2.3   Governor's Reasonable Prediction of Disruption

In the removal letter, Governor Gordon highlighted how it is "important that the professionals governed by the Board of Medicine have confidence that board members prosecute their responsibilities on the board in an objective and unbiased way." (Compl. Ex. 2.) He also wrote of the potential disruptions to the Board's work, part of which is to pass judgment on licensing matters without the appearance of bias or prejudice:

> I believe your comments on this particular legislation could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice. Medical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone. Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality.

(*Id.*) Governor Gordon's concerns about the appearance of bias or partiality are responsive to the words used by Dr. Cubin in his email to the Wyoming House of Representatives.

As discussed above, Dr. Cubin's comments to the Wyoming House went beyond his support for Senate File 0099 and into his personal disagreements with WMS and specific doctors, the same doctors who may appear before the Board to answer a complaint with their medical licenses and livelihoods in jeopardy.[5] He alleged "Dr. Sanderson (and presumably the WMS leadership)" "ignored and suppressed" the contrary position of a different pediatric

---

[5]   The Board is statutorily authorized to "[g]rant, refuse to grant, suspend, restrict, revoke, reinstate or renew licenses to practice medicine." Wyo. Stat. § 33-26-202(b)(i). The Board has the power to investigate allegations that a licensee has violated the Wyoming Medical Practice Act and to take disciplinary action against the licensee upon finding such a violation. *Id.* § 33-26-202(b)(ii).

organization. (Compl. Ex. 1.) These are charged allegations leveled by Dr. Cubin against specific medical providers, providers who could appear before the Board and whose careers and livelihood are affected by his work on the Board. Irrespective of the accuracy of the allegations, Dr. Sanderson and any of the WMS leadership appearing before Dr. Cubin in his role as a Board member could reasonably question whether they would receive fair consideration from him considering Dr. Cubin's allegations to the Wyoming House.

Beyond just Dr. Sanderson and WMS leadership, though, Dr. Cubin's email could also cause others, such as those on the "left" of the partisan divide, to also question whether Dr. Cubin would be a fair and impartial arbiter for them. Dr. Cubin's email expressed his sadness and lost confidence because WMS "has been essentially hijacked by the far left." (Compl. Ex. 1.) A provider who falls in this "left" or "far left" camp could reasonably question whether they can get a fair examination should they have to appear before Dr. Cubin. The same concerns could be had by those many providers who remained silent and did not offer their opinion on WMS's position. It is reasonably possible they too could fear that Dr. Cubin might take their silence as tacit agreement with the "far left" WMS position even if they personally disagreed. Employees in the Executive Branch of the Government or its agencies "are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof." *Nat'l Ass'n of Letter Carriers*, 413 U.S. at 565. Dr. Cubin's assertions about WMS's "hijacking" by the "far left" drew into question his ability or willingness to execute his Board responsibilities "without bias or favoritism for or against any political party or group or the members thereof." *Id.*

To be sure, Dr. Cubin could be recused or recuse himself from particular cases or proceedings that come before the Board. However, the ability to recuse or be recused from

particular proceedings does not avoid disruption of the Board's operations caused by Dr. Cubin's

email comment; it in fact would constitute such disruption. The Middle District of Pennsylvania

considered the potential use of recusal motions in *Stengle*:

> From these facts, one can readily infer that Plaintiff's [speech in question] had the
> potential to induce recusal motions from those who came before her in her
> hearing officer capacity. If such a motion were to be filed, either one of two
> things could happen. Plaintiff could recuse herself, or she could elect to deny the
> motion and hear the case to its conclusion. In either instance, governmental
> efficiency would be adversely affected.
>
> If Plaintiff denied the motion and retained the case, the losing party could appeal
> the decision on due process grounds, alleging that it was denied an impartial
> adjudication of its rights. This would entail additional governmental resources
> being dedicated to the appeal, which would clog dockets and ultimately reduce
> governmental efficiency. On the other hand, if Plaintiff chose to grant the motion
> and recuse herself, the case would be transferred to another hearing officer, which
> would not only serve to delay resolution of the case, but also to clog the docket of
> the newly assigned hearing officer, thereby reducing his or her ability to
> efficiently dispose of his or her load. Accordingly, it is easy to see that an
> increased number of recusal motions would severely hamper the government's
> ability to efficiently and effectively resolve special education issues.

*Stengle*, 631 F. Supp. 2d at 577 (internal citation omitted). The same problems exist concerning

Dr. Cubin's ability to recuse himself or be recused from particular Board proceedings. Increased

use of recusal is not the cure to increased fears of bias and partiality resulting from Dr. Cubin's

email; rather, it is a symptom of the potential problems and governmental inefficiencies

Governor Gordon intended to prevent by removing Dr. Cubin from the Board. It was reasonable

for Governor Gordon to predict Dr. Cubin's extraneous comments to the Wyoming House

concerning WMS and his membership on the Board could cause the Board's impartiality to be

questioned and disrupt at least some of the Board's core functions.

    In balancing Dr. Cubin's First Amendment interests in speaking and petitioning as a

citizen on a matter of public concern against Wyoming's countervailing interests in the impartial

and efficient management of its governmental affairs, the Court finds the balance favors the

government employer. Therefore Dr. Cubin's First Amendment claims fail even if his comments about WMS could be considered a matter of public concern. *See Guarnieri*, 564 U.S. at 398.

### 3.3    Dr. Cubin failed to state a plausible claim of First Amendment retaliation.

Accepting the factual allegations of Dr. Cubin's complaint as true and applying the *Garcetti/Pickering* test to Dr. Cubin's two causes of action for First Amendment retaliation, the Court finds Dr. Cubin's complaint fails to state the second and third elements of the *Garcetti/Pickering* test. Dr. Cubin's comments to the Wyoming House of Representatives about WMS did not involve a matter of public concern and were extraneous to his expressed support of Senate File 0099. Additionally, Governor Gordon's significant interests in promoting impartial and efficient public service by the Wyoming Board of Medicine outweighed Dr. Cubin's rights to free speech and petition the government regarding his comments about WMS. Thus, Dr. Cubin's comments about WMS were not protected by the First Amendment, and Governor Gordon did not violate his First Amendment rights by removing him from the Board of Medicine. *See Fields*, 753 F.3d at 1014 ("a public employee's speech is unprotected ... if it was not on a matter of public concern, or if the balance of interests favors the employer"). Judgment on the pleadings is thus warranted in Governor Gordon's favor on Counts One and Two.

### 4.    Qualified Immunity as to Individual-Capacity Claims

Alternatively, even if Dr. Cubin's complaint satisfied the *Garcetti/Pickering* test, Governor Gordon would be protected from personal liability by the doctrine of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Singh v. Cordle*, 936 F.3d 1022, 1033 (10th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

> "When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate that the defendant violated his constitutional rights and that the right was clearly established." [*Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)]. The law was "clearly established" only if it "was sufficiently clear that every reasonable official would understand that what he [was] doing [was] unlawful." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018) (internal quotation marks omitted). To make such a showing in our circuit, the plaintiff "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (internal quotation marks omitted).

*Id.* at 1033-34. The Supreme Court has consistently admonished courts "not to define clearly established law at a high level of generality." *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011). "'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (citation omitted).

Dr. Cubin's attempts to define clearly established law are far too general. He starts, "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." (ECF 38 p. 21 (quoting *Rankin*, 483 U.S. at 383).) Quite true, "[b]ut such a sweeping pronouncement of the law could not put [Governor Gordon] on fair notice that [his] conduct was illegal." *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1028 (10th Cir. 2015). "The proper and properly-focused inquiry," *id.*, is whether the law clearly established it was unlawful for Governor Gordon to remove Dr. Cubin from the Board in response to Dr. Cubin's comments to the Wyoming House that Governor Gordon worried could create an appearance of bias or prejudice in Dr. Cubin's work with the Board. The generic statement concerning First Amendment retaliation in *Rankin* does not get Dr. Cubin there.

Dr. Cubin offers additional authority, but it too is at an unhelpful "high level of

generality." For example, he notes the "practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs." (ECF 38 p. 22 (quoting *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022).) Again true, but Dr. Cubin's comments about WMS's leadership and internal operations did not concern "governmental affairs." This *Irizarry* quote would not have put Governor Gordon on fair notice that removing Dr. Cubin would subject Governor Gordon to personal liability. *See Frasier v. Evans*, 992 F.3d 1003, 1020-21 (10th Cir. 2021) (Plaintiff's "attempt to distill a clearly established right" based upon general First Amendment principles protecting the creation of speech and news gathering activity ran afoul of "prohibition against defining clearly established rights at high level of generality." Plaintiff failed to demonstrate how officers alleged conduct in retaliation for recording them "follows immediately from the abstract right to create speech and gather news.") (citing *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987).

And Dr. Cubin's caselaw quotations about the history, purpose, and importance of the Free Speech Clause of the First Amendment (ECF 38 pp. 22-23) are accurate, but they play no role in this qualified immunity analysis. No one disputes the significance of the First Amendment's free speech guarantee, but, like all rights, it is not without limits. For example, as noted earlier and applicable here, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti*, 547 U.S. at 417. The history, purpose, and importance of the First Amendment rights would not have fairly put Governor Gordon on notice that he couldn't remove Dr. Cubin from the Board in response to Dr. Cubin's comments to the Wyoming House about his dispute with WMS.

Even if Governor Gordon's decision to remove Dr. Cubin from the Board could be considered a violation of Dr. Cubin's First Amendment rights, Dr. Cubin has not shown the law

was sufficiently clear that every reasonable official would have understood such action to be a constitutional violation. Governor Gordon is therefore protected by qualified immunity against Dr. Cubin's personal-capacity claims.

**5.    Dr. Cubin's State Law Claim**

Dr. Cubin's Count Three asserts Governor Gordon violated his rights guaranteed by the Wyoming State Constitution. As no federal claims remain, and consistent with U.S. Supreme Court guidance, *see, e.g., Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims"), the Court will dismiss without prejudice Dr. Cubin's state law claim.

## CONCLUSION AND ORDER

Despite Dr. Cubin's interlocutory injunction appeal currently pending before the Tenth Circuit, this Court retains jurisdiction to decide Governor Gordon's 12(c) motion for judgment on the pleadings. Due to the *Ex parte Young* doctrine, the Eleventh Amendment does not bar Dr. Cubin's official-capacity claims against Governor Gordon. Nevertheless, Dr. Cubin's Counts One and Two fail to allege viable First Amendment violations under the *Garcetti/Pickering* test, and they are subject to judgment on the pleadings in Governor Gordon's favor. And even if a First Amendment violation existed, Governor Gordon would be protected from personal liability by qualified immunity. Finally, with the adjudication of Dr. Cubin's two federal claims, the Court will decline to exercise pendent jurisdiction over Dr. Cubin's remaining state law claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Judgment on the Pleadings (ECF 26) is **GRANTED**. Judgment on the pleadings is entered in Defendant's favor and against Plaintiff on Counts One and Two. Count Three is dismissed without prejudice. The Clerk of Court will please enter a general judgment and close this case.

**DATED:** April 14th, 2025.

Scott W. Skavdahl
United States District Judge

Add.030

FILED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING



3:14 pm, 4/14/25

**Margaret Botkins**
**Clerk of Court**

DR. FREDERICK WILLIAM "ERIC" CUBIN,
III,

Plaintiff,

vs

MARK GORDON, in both his personal and
official capacities as Governor of Wyoming,

Defendant.

Case Number: 1:24-CV-00164-SWS

---

## JUDGMENT IN A CIVIL ACTION

---

Pursuant to the Order entered April 14, 2025 (ECF No. 63), incorporated by reference

herein, Defendant's Motion for Judgment on the Pleadings (ECF No. 26) is GRANTED.

IT IS HEREBY ORDERED AND ADJUDGED that judgment on the pleadings is

entered in Defendant's favor and against Plaintiff on Counts One and Two, Count Three is

dismissed without prejudice, and the case is closed.

Dated this 14th day of April, 2025.

Margaret Botkins
Clerk of Court

By Elayna Thorsell

Deputy Clerk